# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 28, 2015 Session

## STATE OF TENNESSEE v. BENJAMIN FOUST

**Appeal from the Criminal Court for Knox County**
**No. 98837B      Mary Beth Leibowitz, Judge**

───────────────

**No. E2014-00277-CCA-R3-CD – Filed September 9, 2015**

───────────────

The Defendant, Benjamin Foust, was indicted and, following a jury trial, convicted of ten counts of felony first degree murder, two counts of premeditated first degree murder, four counts of especially aggravated robbery, three counts of aggravated arson, and two counts of unlawful possession of a firearm. See Tenn. Code Ann. §§ 39-13-202, -13-403, -14-302, -17-1307(b). The trial court sentenced the Defendant to a total effective sentence of two consecutive life sentences plus 105 years. In this appeal as of right, the Defendant contends (1) that the trial court erred by allowing the State to admit, as substantive evidence, the prior statement of a co-defendant in violation of Tennessee Rules of Evidence 613 and 803(26); (2) that the trial court erred by failing to merge all of the Defendant's convictions for aggravated arson; (3) that the evidence was insufficient to sustain the Defendant's convictions; (4) that the trial court erred by not allowing the Defendant to stipulate that he had been convicted of prior felonies without disclosing that the convictions were for crimes of force and violence; (5) that the trial court erred by admitting an autopsy photograph of the charred body of one of the victims; (6) that the State improperly vouched for the credibility of a co-defendant who testified against the Defendant at trial; (7) that the trial court erred in instructing the jury regarding the inferences that could be drawn from the possession of recently stolen property; and (8) that the trial court erred by imposing partial consecutive sentences.[1] Following our review, we conclude that the trial court erred by allowing the State to introduce, as substantive evidence, the prior statement of a co-defendant in its entirety, and that this error was not harmless. Accordingly, we reverse the judgments of the trial court and remand this case for a new trial. We also conclude that the evidence was insufficient to sustain one of the Defendant's convictions for aggravated arson. With respect to that conviction, we reverse the judgment of the trial court and dismiss the charge. We will address the remainder of the Defendant's arguments so as not to pretermit his remaining

───────────────

[1] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his appellate briefs.

issues.  See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Case Remanded in Part and Dismissed in Part**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Bruce E. Poston, Knoxville, Tennessee (at trial and on appeal); and Wesley D. Stone, Knoxville, Tennessee (on appeal), for the appellant, Benjamin Foust.[2]

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Randall Eugene Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[3]

*I. Indictment*

In 2012, the Defendant and his co-defendants, Ashlie Tanner and Teddie Jones, were indicted for numerous offenses arising from the August 16, 2011 murders of the victims, Dena and Eric Marsh.  With respect to the offenses committed against Ms. Marsh, the indictment alleged as follows:  Count 1, felony first degree murder "during the attempt to perpetrate" a theft; Count 2, felony first degree murder "during the attempt to perpetrate" a robbery; Count 3, felony first degree murder "during the perpetration of" a theft; Count 4, felony first degree murder "during the perpetration of" a robbery; Count 5, felony first degree murder "during the perpetration of" an arson; Count 6, premeditated first degree murder; Counts 13 and 14, especially aggravated robbery, and Count 17, aggravated arson, listing Ms. Marsh as having suffered a serious bodily injury as a result of the arson.

---

[2] During the pendency of this appeal, Mr. Poston was killed in a single vehicle accident.  Thereafter, Mr. Stone was appointed as counsel of record for the Defendant and allowed to file a supplemental appellate brief.

[3] This section will discuss only the factual background regarding the Defendant's convictions.  The factual background of the Defendant's procedural issues will be discussed in other portions of this opinion.

With respect to the offenses committed against Mr. Marsh, the indictment alleged as follows: Count 7, felony first degree murder "during the attempt to perpetrate" a theft; Count 8, felony first degree murder "during the perpetration of" a theft; Count 9, felony first degree murder "during the attempt to perpetrate" a robbery; Count 10, felony first degree murder "during the perpetration of" a robbery; Count 11, felony first degree murder "during the perpetration of" an arson; Count 12, premeditated first degree murder; Counts 15 and 16, especially aggravated robbery; Count 18, aggravated arson, listing Mr. Marsh as having suffered a serious bodily injury as a result of the arson; and Count 19, aggravated arson of "other property" belonging to Mr. Marsh "at a time when one or more persons were present therein said other property."

The Defendant alone was charged with two counts of unlawful possession of a firearm. In Count 20, the Defendant was charged with possession of a firearm "having been convicted of a felony involving the use of violence," and in Count 21, he was charged with possession of a firearm "having been convicted of a felony involving the use of force."

## II. State's Proof at Trial

Robert Cowles testified that he was the minister of the church the victims attended and that on August 16, 2011, he went to their house to check on Mr. Marsh. Mr. Cowles explained that Mr. Marsh "had recently had surgery" on his shoulder and left arm and that he "wasn't at church the previous Sunday." Mr. Cowles estimated that he arrived at the victims' house around 7:30 or 7:45 that night. Mr. Cowles testified that he visited with the victims in their living room and recalled that Mr. Marsh's arm was still in a sling from his surgery. Mr. Cowles noticed that there were "several prescription bottles" on the table beside Mr. Marsh's chair and assumed they were "pain medicines" that Mr. Marsh was taking because of the surgery. At some point, Ms. Marsh excused herself to go lie down in "the back bedroom." Mr. Cowles testified that he left the victims' home at approximately 8:15 that night.

James Morsch testified that he was a former firefighter and that on the evening of August 16, 2011, he was driving in the victims' neighborhood when he smelled smoke. Mr. Morsch stated that he turned his car around "to investigate" the smell and saw "considerable smoke and flames" coming from a house in the neighborhood. Mr. Morsch drove to the house and saw "flames shooting out of . . . a back window about [twenty-five] to [thirty] feet in the air." Mr. Morsch testified that as bystanders called 911,[4] he started "beating on the door and screaming" to determine if anyone was inside the house. Another bystander kicked the door open, and Mr. Morsch crawled into the entry of the

---

[4] The Knox County Emergency Communications District received the first 911 call about the fire at 9:10 p.m.

-3-

house. Mr. Morsch testified that "it was pitch black" in the house and "extremely hot." Mr. Morsch "stretched out as far as [he] could and tried to reach around and see if [he] could feel anyone." Mr. Morsch did not feel anyone and was quickly forced out of the house due to the heat and smoke.

Most of the evidence regarding the police investigation of the murders was introduced at trial through the testimony of Danielle Wieberg, an evidence technician for the Knoxville Police Department (KPD). Ms. Wieberg testified that when she arrived on the night of August 16, 2011, the victims' house was still burning. Shortly after she arrived, the firefighters pulled Mr. Marsh's body from the house. Ms. Wieberg was not able to enter the house until approximately 10:15 that night. Ms. Wieberg recalled that she entered the house through the front door and into the living room. Ms. Wieberg described the house as being significantly burned with soot, charring, and smoke damage "throughout the entire home," and that "part of the roof was missing" leaving everything "covered in insulation."

Ms. Wieberg testified that Mr. Marsh's body was found beside "a large couch" in the living room. Near where Mr. Marsh's body was found, Ms. Wieberg found a pair of shorts with "a large quantity of . . . blood on them." Ms. Wieberg also found "a blue comforter that had a large quantity of what appeared to be blood on it" in the living room. Ms. Wieberg testified that in the living room there was a chair with "a long sleeved t-shirt [tied] around it." Ms. Wieberg found "a large quantity of what appeared to be blood" on the shirt and blood stains on the chair. There were also "several areas" of what appeared to be blood spatter on the wall directly across from the front door and "several, small dark stains" on the entertainment center in the living room.

Ms. Wieberg testified that the firefighters found a "white [container] of what looked like lighter fluid" in the dining room. Later, Ms. Wieberg found what she believed to be blood spatter on a "transition wall between the living room and the kitchen" and on a "piece of board that was . . . leaned up against" that wall. Ms. Wieberg also found "some small areas of bloodstain" on one of the kitchen cabinets. Ms. Weiberg testified that on the floor "in front of the cabinet near the kitchen back door," there was a purse with a "roofing hatchet . . . lying across the center" of it. Ms. Weiberg described the roofing hatchet as "a large hammer like object that had a mallet head on one end and . . . a hatchet end on the other half." Ms. Wieberg testified that the hatchet had what appeared to be blood on the mallet head.

Ms. Marsh's body was found in the back bedroom of the house. Ms. Wieberg testified that a small hammer was found "nearby" the body. In the back bedroom, a "piece of fabric" was found "saturated" with what Ms. Wieberg believed was blood. In a back corner of the bedroom, "a partially burned pillowcase that had several pill bottles in it" was found. In the same corner, "a small red purse that had some other pill bottles in it

-4-

and some jewelry" was also found. Ms. Wieberg testified that "a severely burned shotgun" was found "between what remained of the mattresses."

Ms. Wieberg testified that the day after the fire, arson investigators brought "an arson dog" to the house to attempt to detect if an accelerant was used. Ms. Wieberg photographed the locations where the dog "alerted," and the arson investigators took samples of the flooring. Ms. Wieberg also testified that two days after the fire, she entered the downstairs garage of the house. Inside the garage, Ms. Wieberg found a large area of blood on the floor by a table saw. There was also blood on a tool case by the saw, in addition to drops of blood in other areas of the garage. Ms. Wieberg was allowed to testify as an expert in "bloodstain pattern analysis" and opined that Mr. Marsh was attacked and injured downstairs in the garage, managed to make his way upstairs, and was attacked a second time upstairs.

During the investigation, Mr. Jones, who was Mr. Marsh's stepson from another marriage, along with Ms. Tanner and the Defendant were identified as suspects. On August 18, 2011, the Defendant and Ms. Tanner were arrested in the parking lot of a grocery store. Ms. Tanner was driving the Defendant's Ford Explorer, and the Defendant was in the passenger seat. The vehicle was green except for the driver's side door, which was red, and had an Anderson County license plate. Also, the panel above the front left wheel well had been completely removed from the vehicle. In the back of the vehicle, police found a Remington twelve gauge shotgun wrapped in "a comforter or a bedspread." When he was arrested, the Defendant had a cut on one of his fingers. The police searched the house where the Defendant lived and found two jewelry boxes and several pieces of jewelry in some garbage bags in the utility room of the house. A first aid kit was also found at the house.

Police also searched the apartment of Mr. Jones. There they found a rock and a sock with what appeared to be blood on them in the laundry room. In Mr. Jones's bathroom, the shower and sink tested positive for the presence of blood. Police were able to identify the dumpster used by the apartment complex and located the trash from the apartment complex at "a dump station." There the police found bottles of bleach, two pairs of shoes, a pair of jeans, and two shirts. Police found what they believed to be blood on a green and yellow pair of shoes, the jeans, and both of the shirts. The arson dog also "alerted" for the presence of an accelerant on one of the shirts, the jeans, and the green and yellow shoes.

Mr. Marsh's stepfather, Philip Lanteri, testified that Mr. Jones "would steal things out of [Mr. Marsh's] house." According to Mr. Lanteri, Mr. Jones had stolen "pain pills" from Mr. Marsh in the past and would take "basically anything [else] of value" he could find. Mr. Marsh bought a safe and a "safety deposit box" because of the thefts. Mr. Lanteri testified that Mr. Marsh kept the safe in the closet of the back bedroom "bolted to

the floor." Mr. Lanteri also testified that Mr. Marsh kept his "pain medication in the safety deposit box." Mr. Lanteri identified the shotgun found in the back of the Defendant's vehicle as one he had given Mr. Marsh as collateral for a loan. Ms. Marsh's niece and daughter identified the jewelry boxes and several pieces of jewelry found at the house where the Defendant lived as belonging to Ms. Marsh.

Timothy Schade, a latent print examiner with the KPD, testified that he recovered fingerprints of the Defendant's left ring finger, left middle finger, and right thumb from the shotgun found in the Defendant's vehicle. Laura Hodge, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert "in the field of microanalysis." Ms. Hodge testified that one of the yellow and green shoes found in Mr. Jones's trash and the white container found at Mr. Marsh's house tested positive for an accelerant. Samples taken from the back door and hallway of Mr. Marsh's house tested positive for a different kind of accelerant. Ms. Hodge opined that "at least two types of ignitable fluids [were] used in this case." Other forensic analysis conducted by the TBI revealed the presence of Mr. Marsh's blood on the roofing hatchet found at the house; blood on the jeans recovered from Mr. Jones's trash and a combination of Mr. Jones and Mr. Marsh's DNA on the jeans; and Mr. Jones's DNA on the green and yellow shoes, but no blood.

Doctor Christopher Lochmuller, an expert in forensic pathology with the Knox County Medical Examiner's Office, testified that he performed autopsies on the bodies of Mr. and Ms. Marsh. According to Dr. Lochmuller, Mr. Marsh was "beaten mainly around the head area." There were twelve lacerations to Mr. Marsh's scalp. Dr. Lochmuller testified that the force of the blows to Mr. Marsh's head were so great that it caused "bleeding around the brain particularly on the left side" and five bruises on his brain. Mr. Marsh also suffered two depressed skull fractures, which Dr. Lochmuller explained meant that "whatever struck the skull actually had enough force to kind of push the skull inward a little bit rather than just . . . fracturing it." Mr. Marsh also had bruises on the back of his right hand and forearm, which Dr. Lochmuller opined were "defensive wounds." Dr. Lochmuller testified that Mr. Marsh had soot in his nostrils and lungs as well as "a fairly high percentage of carbon monoxide in his blood." Dr. Lochmuller opined that Mr. Marsh was alive at the time the fire was started and that the cause of his death was a combination of "multiple blunt force injuries and inhalation of products of combustion."

Dr. Lochmuller testified that Ms. Marsh's body was over ninety-five percent covered in third degree burns and "charring injuries." According to Dr. Lochmuller, the only area of Ms. Marsh's body which was not burned was the left side and back of her head. There were three lacerations on the left side of her head and "a large laceration" on the back of her head. Dr. Lochmuller explained that the lacerations "bled enough to kind

of create a pool of blood" that "protected that area of skin" from the flames. Dr. Lochmuller testified that Ms. Marsh suffered a depressed skull fracture on the left side of her head and a skull fracture on the back of her head. During the autopsy, Dr. Lochmuller found evidence that Ms. Marsh had inhaled soot and that there was carbon monoxide in her blood. Dr. Lochmuller opined that Ms. Marsh was alive at the time the fire was started and that the cause of her death was a combination of blunt force injuries to the head and "inhalation of products of combustion." Dr. Lochmuller also opined that the injuries to Mr. and Ms. Marsh could have been caused by the mallet head of the roofing hatchet or the small hammer found near Ms. Marsh's body.

Co-defendant Ashlie Tanner testified that she received a plea offer from the State to plead guilty to facilitation of felony first degree murder and receive a sentence of twenty-five years with a release eligibility of thirty percent in exchange for her "truthful testimony" at trial. Ms. Tanner further testified that if she did not testify truthfully, she would not "get the deal." The Defendant was Ms. Tanner's boyfriend at the time of the murders, and she claimed at trial that she did not want to testify against the Defendant because she still loved him. In August 2011, Ms. Tanner lived with the Defendant at the Defendant's mother's house.

Ms. Tanner testified that she had known the other co-defendant, Mr. Jones, longer than the Defendant, that she and Mr. Jones would get "high together," and that on one occasion they "had intimate relations." According to Ms. Tanner, she regularly met with Mr. Jones to "shoot up" oxycodone and cocaine while the Defendant was at "school or work." Ms. Tanner claimed that the Defendant also abused oxycodone but that she hid what she did with Mr. Jones from the Defendant because "[p]eople look at it a little different when you're shooting up, and [she] knew that [the Defendant] would leave [her] if he caught [her] shooting up pills." Ms. Tanner denied having a sexual relationship with Mr. Jones at the time of the murders.

Ms. Tanner claimed that on the afternoon of August 16, 2011, Mr. Jones's girlfriend dropped him off at the Defendant's mother's house. According to Ms. Tanner, Mr. Jones and the Defendant spent the afternoon "[w]orking on [the Defendant's] mom's car." Mr. Jones and the Defendant "were talking about" going to Mr. Marsh's house "to get some tools" to work on the car. So, Ms. Tanner, the Defendant, and Mr. Jones got in the Defendant's vehicle to drive to the victims' house. Ms. Tanner testified that the Defendant drove, she sat in the front passenger seat, and Mr. Jones sat in the back seat. Ms. Tanner did not recall the Defendant drinking while he was working on the car, but she claimed that he had a beer as he drove to the victims' house. On the way there, they stopped at a gas station where the Defendant got out to buy a pack of cigarettes. Ms. Tanner claimed that while the Defendant was inside the gas station, Mr. Jones "changed the tags on the car" to the "temporary tags [from] his car."

Ms. Tanner testified that once the Defendant got back to the vehicle, he drove them to the victims' house. Ms. Tanner claimed that no one spoke on the way to the victims' house, except for Mr. Jones saying that "he was gonna get pills . . . [b]ut he didn't say from where." According to Ms. Tanner, they parked in the driveway, and Mr. Jones went in the front door of the house while she and the Defendant stayed in the vehicle. Mr. Jones was inside for ten or fifteen minutes before he "waved [them] to come inside." Mr. Jones led them in a "side door" to "the living room area by the dining room." Ms. Tanner claimed that Mr. Jones entered the house first followed by the Defendant. Ms. Tanner further claimed that she entered the house last and that as she entered, the Defendant told her "not to step in any blood."

Ms. Tanner testified that she did not see any blood when she entered the house, but she assumed that they "were gonna commit a robbery at that point" because they were "all junkies." Ms. Tanner claimed that once she entered the house, the Defendant and Mr. Jones went "towards the kitchen," and she walked "down the hall to find a bathroom." Ms. Tanner explained that she "had pills . . . that nobody knew [she] had" and that she wanted to "shoot up" in secret because she "didn't want [the Defendant] to know." As she was walking down the hallway, Ms. Tanner heard "gurgling" coming from the back bedroom.

Ms. Tanner testified that she walked into the bedroom and saw Ms. Marsh lying "on the floor by the bed" with "a head injury." As Ms. Tanner walked toward Ms. Marsh, Mr. Jones "came in the room and he hit her again." Mr. Jones then gave Ms. Tanner a pillowcase and told her "to put everything" from an open drawer in the bedroom inside the pillowcase. Ms. Tanner testified that the Defendant walked into the bedroom and stood behind Mr. Jones as Mr. Jones was giving her the pillowcase. According to Ms. Tanner, she started filling the pillowcase with "papers and pill bottles" from the drawer while the Defendant and Mr. Jones left the room. Ms. Tanner testified that she sat "the pillowcase on the bed" and accidently left it there because she "was scared and . . . just wanted to get out of the house."

Ms. Tanner started back down the hallway when Mr. Marsh "walked around the corner from like the kitchen area." Ms. Tanner testified that she "squatted down" because she thought Mr. Marsh was coming towards her. At that point, Mr. Jones "came around the corner and . . . hit [Mr. Marsh] again." Ms. Tanner claimed that she turned around while Mr. Jones was attacking Mr. Marsh. When she turned back around, Mr. Jones was covering Mr. Marsh "up with a blanket," and the Defendant was standing next to Mr. Jones "by the door or coming like he was coming in the door." Ms. Tanner saw blood on Mr. Marsh's head and on the floor. Ms. Tanner testified that Mr. Marsh called Mr. Jones by his nickname and kept asking, "[W]hy, Peanut[?]"

Ms. Tanner testified that after Mr. Jones attacked Mr. Marsh, she "went out the door and got in the car" while Mr. Jones and the Defendant went back into the kitchen. Ms. Tanner claimed that she was in the car when the fire was started and did not know about the fire until after she was arrested. According to Ms. Tanner, the Defendant came "out with the safe and [got] in the car." Ms. Tanner testified that Mr. Jones came out next and that when he got to the car, he told her "to drive through the yard." According to Ms. Tanner, she drove them all back to Mr. Jones's apartment. Ms. Tanner claimed that on the way back to Mr. Jones's apartment, he said that he had left a purse and a hammer at the victims' house. Ms. Tanner also claimed that Mr. Jones "yelled at [her] for leaving the pillowcase" as she drove them back to his apartment. Ms. Tanner testified that when they got to Mr. Jones's apartment, the Defendant and Mr. Jones carried the safe inside the apartment.

Ms. Tanner testified that once they were inside the apartment, they "crushed up some pills and snorted the pills." Ms. Tanner did not know where Mr. Jones had gotten the oxycodone that they used that night, but she did not believe that he had it before they went to the victims' house. Ms. Tanner testified that Mr. Jones and the Defendant opened the safe with a crowbar and that the Defendant cut his finger while they were opening it. According to Ms. Tanner, "there wasn't anything really in" the safe once they opened it. Mr. Jones told the Defendant and Ms. Tanner to dispose of the safe. Ms. Tanner testified that she and the Defendant drove back to his mother's house and put the safe on her back porch. Ms. Tanner claimed that the Defendant also put a shotgun "underneath the Winnebago in the backyard" of his mother's house and that she had not seen the shotgun before that. According to Ms. Tanner, the Defendant told her "not to be alone with [Mr. Jones] anymore" after that night.

Ms. Tanner and the Defendant then went to a nearby grocery store "to get stuff to bandage [his] finger, bleach, . . . and some things for his mom." Ms. Tanner was shown surveillance video from the grocery store and identified herself and the Defendant in the video. The video showed the couple at the store from 10:00 to 10:36 p.m. Ms. Tanner testified that when they went to the grocery store, she and the Defendant were wearing the same clothes they had worn during the murders. Ms. Tanner testified that when they got back to the Defendant's mother's house, they cleaned the safe and the safety deposit box taken from the victims' home with bleach. Ms. Tanner claimed that she and the Defendant then took the safe and safety deposit box to a dumpster and went back to his mother's house. According to Ms. Tanner, she then cleaned and bandaged the Defendant's finger, and they "did more pills."

Ms. Tanner testified that she put the bottle of bleach they used to clean the safe and safety deposit box in a garbage bag and took it outside. According to Ms. Tanner, in addition to the shotgun, the safe, and the safety deposit box, she and the Defendant

brought jewelry taken from the victims' home to the Defendant's mother's house. Ms. Tanner claimed that she did not know who took the jewelry from the victims' house but admitted that she carried it from Mr. Jones's apartment to the Defendant's mother's house. Ms. Tanner testified that Mr. Jones was going to come by the next day and pick up the jewelry to pawn it and that she assumed he wanted them to hold it because he did not want his girlfriend to find the jewelry at his apartment. Ms. Tanner claimed that she was "not sure" why the police found the jewelry and jewelry boxes in a trash bag with the bleach bottles when they searched the house.

Ms. Tanner testified that the day after the murders, she and the Defendant went to sell the shotgun and buy some marijuana from a friend. According to Ms. Tanner, the Defendant took the shotgun from under the Winnebago, wrapped it in a blanket, and put it in the back of his Ford Explorer. However, Ms. Tanner and the Defendant were arrested shortly after they left to sell the shotgun. Ms. Tanner initially told the police that she and the Defendant "were at home watching a movie, that [Mr. Jones] had come over, and then [Mr. Jones] went back to his house." Ms. Tanner testified that she lied to the police because she did not want herself or the Defendant "in trouble," but she confessed after she found out that the police had already spoken to Mr. Jones.

On cross-examination, Ms. Tanner admitted that she would be eligible for parole after serving less than eight years in prison due to her plea agreement with the State. Ms. Tanner also admitted that Mr. Jones was the only person she saw with the hammer during the murders and that she did not "see anything in [the Defendant's] hands" while they were in the victims' house. Ms. Tanner testified that she did not know why Mr. Jones would switch out the tags on the Defendant's Explorer when it was green with a red driver's side door, which Ms. Tanner testified did not work, and was missing a significant portion of the paneling in the front. Ms. Tanner further admitted that the vehicle did not have a temporary tag on it when she and the Defendant were arrested.

Also on cross-examination, Ms. Tanner testified that when she entered the victims' house, she went down the hallway because she "just assumed" there would be a bathroom that way even though she had never been in the house. Ms. Tanner claimed that she did not know how jewelry got in the pillowcase she left in the back bedroom and insisted that she only put papers and pill bottles in it. Ms. Tanner admitted on cross-examination that, after her arrest, she told the Defendant, her mother, and her aunt that she was pregnant. Ms. Tanner claimed that she actually thought she was pregnant at the time of her arrest but admitted that she lied to the Defendant, her mother, and her aunt for several months, eventually lying to them about having a miscarriage. When asked why the jury should believe her after lying to her mother and her aunt about a pregnancy and a miscarriage, Ms. Tanner responded that she "was sworn to tell the truth" at trial, and she "was not sworn to tell [her] mother and [her] aunt the truth."

-10-

On redirect examination, Ms. Tanner testified that her testimony was the truth and that "if [she] got caught in a lie" she would lose her plea deal.  Ms. Tanner also claimed that the Defendant asked her to "take" the charges regarding the shotgun found in his vehicle.  During redirect examination, the State played a phone call Ms. Tanner made from jail to her aunt shortly after her arrest.  In the phone call, Ms. Tanner told her aunt that Mr. Jones and the Defendant yelled at her and told her to go back to the car because she screamed when she saw Mr. Marsh and started crying.  Ms. Tanner stated that she went back to the Explorer and started the ignition and that the Defendant came back first followed by Mr. Jones.  Ms. Tanner further stated during the jail call that Mr. Jones and the Defendant yelled at her for forgetting the pillowcase and that Mr. Jones was mad because he left the hammer inside the house.

### III. Defendant's Proof

Brent Cox testified that he was a Knoxville resident and that he remembered August 16, 2011, because he and the Defendant "had a lot of fun that day, and that was the last time that [they] got to hang out together."  Mr. Cox recalled that he went to the Defendant's mother's house around 4:00 p.m. that day and that they worked on the Defendant's mother's car until around 7:30 or 8:00 p.m.  Mr. Cox testified that he did not see Mr. Jones or Ms. Tanner at all that afternoon and that Ms. Tanner "was gone in the [Defendant's] Explorer."

Mr. Cox testified that he and the Defendant "were drinking [and] having a good time" that afternoon.  Mr. Cox recalled that they had "[e]xcessive amounts" of alcohol that day, estimating that they drank a case of beer along with some liquor.  Mr. Cox testified that when he left, the Defendant "was passed out" and that he "had to help [the Defendant] in the house [because] he couldn't stand up, he couldn't walk."  Mr. Cox further testified that Ms. Tanner had a reputation in the community "for being a liar."

On cross-examination, Mr. Cox admitted that he had only known the Defendant since 2009, but he claimed that during the time he knew the Defendant, he saw the Defendant once a week.  Mr. Cox also admitted that he drove home drunk from the Defendant's mother's house on August 16, 2011.  Mr. Cox further admitted that he never told the police about what he had testified to but claimed that he had contacted the office of the Defendant's attorney and had spoken to the attorney's investigator about it.

Co-defendant Teddie Jones testified that he and Ms. Tanner were seeing each other three or four times a week and taking pills "[p]retty much any way that you could do a pill . . . eating them, snorting them, shooting them.  That was the extent [of their] relationship."  Mr. Jones claimed that the Defendant was jealous of his relationship with Ms. Tanner, but he denied ever having "a physical relationship" with her.  According to

-11-

Mr. Jones, the Defendant knew Ms. Tanner was shooting up and "didn't approve of it." So, Mr. Jones and Ms. Tanner would meet secretly.

Mr. Jones testified that on the afternoon of August 16, 2011, he was alone at his apartment. Mr. Jones denied going over to the Defendant's mother's house to work on a car. According to Mr. Jones, he called Ms. Tanner for a ride that evening so they could "go to get pills." Mr. Jones testified that when Ms. Tanner picked him up at his apartment, he was surprised to see the Defendant in the Ford Explorer. Mr. Jones recalled that Ms. Tanner was driving and that the Defendant "was extremely drunk." Mr. Jones denied talking to the Defendant "at all about where [they] were going or anything that day."

Mr. Jones testified that he told Ms. Tanner that they "were gonna go buy some pills," and there was never any discussion about getting tools from Mr. Marsh. According to Mr. Jones, he got the roofing hatchet from a neighbor and brought it with him to the victims' house. Mr. Jones claimed that once they got to the victims' house, the Defendant never got out of the vehicle, went inside the house, or carried anything out of the house. According to Mr. Jones, only he and Ms. Tanner went inside the house. Mr. Jones testified that he could not recall who carried the shotgun out of the house, but he claimed that Ms. Tanner carried out the jewelry boxes.

Mr. Jones testified that Ms. Tanner drove them back to his apartment but denied saying anything to Ms. Tanner about leaving the roofing hatchet in the victims' house. Mr. Jones claimed that he tricked the Defendant into helping him open the safe by telling the Defendant that it was his and that he had broken it. Mr. Jones testified that the Defendant "cut his hand" while trying to open the safe. According to Mr. Jones, after the Defendant cut his hand he, "[f]lipped out, went back outside and got in the car." Mr. Jones claimed that Ms. Tanner took the jewelry and the shotgun to "take care of selling" them and that he and Ms. Tanner split the pills between themselves. Mr. Jones denied that the Defendant took anything from his apartment that night.

Mr. Jones testified that he pled guilty to all of the charges he was facing without a plea agreement. Mr. Jones claimed that he did not want to go to trial or testify in court but that he was testifying on behalf of the Defendant because it "was the right thing to do." Mr. Jones reiterated that the Defendant was not "in the house" when he committed the offenses and that the Defendant did not know "what was gonna happen" that night.

Mr. Jones admitted on cross-examination that his testimony at trial was the first time he had told anyone other than his lawyer "this version" of what happened on August 16, 2011. Mr. Jones recalled speaking to the police on August 17, 2011, after having been advised of and waiving his constitutional rights. Mr. Jones admitted that he told the police that the Defendant was inside the victims' house instead of him. Mr. Jones did not

recall telling the police that the Defendant and Ms. Tanner "wanted to do a robbery." Mr. Jones testified that he did recall telling the police that he gave Ms. Tanner and the Defendant information about Mr. Marsh and that "they went and did the robbery."

Mr. Jones also remembered telling the police that the Defendant and Ms. Tanner came back to his apartment and told him about the robbery. Mr. Jones did not recall giving the police "a detailed description of what" the Defendant had told him. Mr. Jones did recall telling the police about how the Defendant injured his hand. Mr. Jones did not remember telling the police that he was afraid of the Defendant and his "connections." Mr. Jones testified at trial that he was not afraid of the Defendant and was "not aware of any connections" the Defendant had. Mr. Jones did admit that he told the police in a second statement that he was inside the house with the Defendant and Ms. Tanner when the offenses were committed.

After questioning Mr. Jones about the prior statements he made to the police, the State introduced a recording of Mr. Jones's second statement to the police. The recording was played in whole to the jury. During the statement, Mr. Jones claimed that the Defendant committed the murders while he just stood there "like a f--king idiot." Mr. Jones also claimed that the Defendant set the house on fire. Mr. Jones told the police that the Defendant had threatened to kill him and that the Defendant was a member of a white supremacists gang, the Aryan Circle. Mr. Jones also told the police that the Defendant and Ms. Tanner had "a fence" they used regularly for stolen goods and that the Defendant and another Aryan gang member were planning on robbing a coin store.

Mr. Jones testified that in his statements to the police, he was lying in an attempt to "save [his] own ass" and that most of the statement played to the jury was false. Mr. Jones also denied that he had been attacked by the Defendant twice while they were in jail. Mr. Jones admitted that he had been in two "altercations" with the Defendant but claimed that he "started it" instead of the Defendant. Mr. Jones further testified that he had not "been in the same pod" with the Defendant in jail in over two years.

*IV. Verdict and Sentencing*

Based upon the foregoing evidence, the jury convicted the Defendant of all the charged offenses. The trial court merged all of the murder convictions with Mr. Marsh listed as the victim into Count 4, felony first degree murder "during the perpetration of" a robbery. The trial court merged all of the murder convictions with Ms. Marsh listed as the victim into Count 10, felony first degree murder "during the perpetration of" a robbery. The trial court merged the two especially aggravated robbery convictions involving Ms. Marsh as the victim into Count 13. The trial court likewise merged the two especially aggravated robbery convictions involving Mr. Marsh as the victim into Count 15. The trial court did not merge Counts 17 and 18 of aggravated arson but did

merge the aggravated arson conviction in Count 19 into Count 18. The trial court also merged the Defendant's convictions for unlawful possession of a firearm into Count 20.

The Defendant's presentence report revealed that the Defendant had prior convictions for aggravated robbery, aggravated burglary, driving under the influence (DUI), theft, assault, simple possession, and possession of drug paraphernalia. The Defendant was on probation for a DUI conviction at the time of these offenses. The Defendant had an extensive history of probation violations and having alternative sentences revoked. The Defendant also committed numerous disciplinary infractions while he was incarcerated.

The Defendant was sentenced to life for each of the felony murder convictions. In sentencing the Defendant for the other convictions, the trial court found that the following enhancement factors applied to the Defendant: (1) that the Defendant had a previous history of criminal convictions and behavior, in addition to those necessary to establish the appropriate range; (4) that Mr. Marsh was particularly vulnerable "due to his physical disability"; (5) that the victims were treated with exceptional cruelty during the commission of the offense; (8) that the Defendant had previously failed to comply with the conditions of a sentence involving release into the community; and (13) that the Defendant was released on probation at the time of the offenses. Tenn. Code Ann. § 40-35-114. The trial court did not find that any mitigating factors applied to the Defendant.

The trial court sentenced the Defendant to forty years for each of the especially aggravated robbery convictions; twenty-five years for each of the aggravated arson convictions; and two years for the unlawful possession of a firearm conviction. With respect to consecutive sentencing, the trial court found that the Defendant's record of criminal activity was extensive, that he was on probation when he committed the offenses, and that he was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). The trial court ordered all of the Defendant's sentences to be served consecutively, except for the aggravated arson conviction in Count 18 and the unlawful possession of a firearm conviction in Count 20, for a total effective sentence of two lifetimes plus 105 years.

## ANALYSIS

### I. Issues Requiring Reversal

#### A. Admission of Mr. Jones's Statement to the Police

The Defendant contends that the trial court erred by allowing the State to admit, as substantive evidence, the prior statement of Mr. Jones in violation of Tennessee Rules of

Evidence 613 and 803(26). The Defendant argues that the trial court failed to conduct a hearing on whether the statement was made under circumstances indicating trustworthiness as required by Rule 803(26), that the statement was inherently untrustworthy because Mr. Jones admitted at trial that he was lying in the statement, and that the trial court introduced the statement in its entirety, which included statements from Mr. Jones that were not inconsistent with his trial testimony as well as statements that were "irrelevant and inflammatory." The State responds that the trial court satisfied the requirements of Rule 803(26) and that the statement was inconsistent with Mr. Jones's testimony at trial.

During cross-examination, Mr. Jones was asked a litany of questions about two statements he gave to the police after his arrest. When asked about his first statement to the police, Mr. Jones testified that "[a]fter being there for [twelve] hours, [he] told [the police] what they wanted to hear." Mr. Jones admitted that he told the police the he had not been inside the victims' house but that the Defendant had been.

Mr. Jones also admitted that he told the police that he had given information about Mr. Marsh to Ms. Tanner and the Defendant, that the Defendant and Ms. Tanner told him about what happened at the victims' house after the robbery, and that he told the police about the injury to the Defendant's hand. Mr. Jones did not remember telling the police in his first statement that Ms. Tanner and the Defendant "wanted to do a robbery" or giving the police "a detailed description" of what the Defendant said about the crimes.

Mr. Jones was then asked about a second statement that he gave to the police.[5] Mr. Jones testified that he did not remember telling the police he was afraid of the Defendant or "the connections that" the Defendant had. Mr. Jones did recall telling the police in the second statement that he was present inside the victims' house with Ms. Tanner and the Defendant during the crimes. At that point, the State sought to have Mr. Jones's second statement played for the jury and admitted as substantive evidence pursuant to Rule 803(26).

The following exchange then occurred during a bench conference:

[Trial court]: Actually, what's happening is, I have to actually conduct a hearing outside the presence of the [j]ury to determine by a preponderance of the evidence if the entire statement was made under circumstances (inaudible).
[Defense counsel]: And the thing is, he's gonna say, I lied to save my butt until the DNA came in.

---

[5] Contrary to the State's assertion in its brief, Mr. Jones's statement to the police was not given under oath.

[Prosecutor]:  That's different, that's - - that's an argument, but the question for - -
[Trial court]:  You must realize (inaudible).
[Defense counsel]:  Well, then we're gonna have to edit.
[Prosecutor]:  Oh, no, no.  Huh-uh (no).  He said that.
[Trial court]:  How long is it?
[Prosecutor]:  It's [twenty] minutes long.  Oh, no.  He said - -
[Trial court]:  Why can't we edit it?
[Prosecutor]:  Oh, no.
[Defense counsel]:  Whenever he says they (inaudible) these two went in the house.
[Prosecutor]:  That's what he just said.
[Trial court]:  (Inaudible).
[Defense counsel]:  It's what he was wanting.  He said - -
[Prosecutor]:  That's your argument.  That's your argument.
[Trial court]:  (Inaudible).
[Defense counsel]:  Well, I covered it in - - I covered it in the opening.
[Trial court]:  (Inaudible).

The statement was then played for the jury in its entirety.

At the beginning of the statement, Mr. Jones offered to tell the police about "people that [Ms. Tanner and the Defendant] deal with as far as drug dealers."  The detectives then turned the conversation back to the offenses at issue in this case.  Mr. Jones stated that "s--t happened that [he] didn't intend and that [he] didn't expect to see what [he] saw."  Mr. Jones told the police that he was not "a killer" and "not no [sic.] badass."

Mr. Jones then said that on August 16, 2011, he helped the Defendant work on his mother's car at her house.  Mr. Jones claimed that later, he told the Defendant how to enter the victims' house and that, at first, he stayed in the car while Ms. Tanner and the Defendant went inside.  Mr. Jones said that, later, he heard "a yell" and went into the house.  Mr. Jones claimed that when he walked in the door, he saw the Defendant "f--king beating [Mr. Marsh] to death," and he "froze up."  Mr. Jones told the police that the Defendant initially "caught [Mr. Marsh] in the basement."

Mr. Jones said that he did not expect the Defendant to kill the victims.  Mr. Jones then identified the roofing hatchet as what the Defendant used to beat Mr. Marsh.  At that point, Mr. Jones broke down crying and said that he "should have f--king done something" instead of just standing there the entire time "like a f--king idiot."  After composing himself, Mr. Jones told the police that the Defendant had said later that he had attacked Mr. Marsh in the downstairs garage, then had attacked Ms. Marsh upstairs, and,

-16-

after that, had attacked Mr. Marsh a second time after Mr. Marsh managed to make it upstairs.

Mr. Jones stated that Ms. Tanner and the Defendant had "s--t in the hallway" and that "they were both grabbing stuff" when he walked in the house. Mr. Jones claimed that he moved out of the way when the Defendant started "spraying [lighter fluid] f--king everywhere." Mr. Jones said that the Defendant ran down the hallway and into the back bedroom with the lighter fluid. Mr. Jones then detailed what he claimed Ms. Tanner and the Defendant had taken from the house: a safe from the closet in the bedroom, a safety deposit box, bottles of pills, and jewelry. Mr. Jones also said that he thought Ms. Tanner left a pillowcase full of "pain pills" in the bedroom.

Mr. Jones stated that he did not know what happened to the hatchet. Mr. Jones then stated that after they set fire to the house, the Defendant and Ms. Tanner went "straight to" his apartment. Mr. Jones said that the Defendant carried what he had taken from the victims' house inside and started going through it. Mr. Jones claimed that the Defendant used a pry-bar to "rip open the safe" and screamed at him to hold the safe.

Mr. Jones said that while they were trying to open the safe, the Defendant screamed at him, "You better f--king do what you're goddamn supposed to do or I'm gonna f--king kill you and your kids and your old lady and if I can't f--king do it I've got people that can." Mr. Jones explained that the Defendant was referring to "his prospects" in the Aryan Circle. Mr. Jones and the detectives then discussed the growing prevalence of Aryan gangs, and the detectives asked how Mr. Jones "hooked up with" the Defendant because Mr. Jones did not seem like "the type to hook up with that type of people."

Mr. Jones told the detectives that there was not really anything in the safe or the safety deposit box and that the Defendant was "real f--king scary" after that. Mr. Jones said that the clothes he wore at the victims' house were taken by Ms. Tanner and the Defendant. Mr. Jones then told the police about the guns he believed the Defendant owned. Mr. Jones told the police that he knew "a fence" Ms. Tanner and the Defendant used for stolen antiques. Mr. Jones also told the police that the Defendant and one of his fellow Aryans gang members were planning on robbing a coin store in Sevier County. Mr. Jones again offered to give the police the names of people Ms. Tanner and the Defendant "deal with."

Mr. Jones was asked what their intentions were when they went to the victims' house. Mr. Jones said that he did not know what the Defendant was planning to do, but he thought the Defendant was just going to "run in" and take things. Mr. Jones also said that the Defendant got the roofing hatchet out of his toolbox before going in the house. Mr. Jones then told the police that the Defendant had cut one of his fingers trying to open the safe. Mr. Jones claimed that Ms. Tanner and the Defendant argued at his apartment

because she left pills at the victims' house. Mr. Jones further claimed that the Defendant was mad at him for "just [being] in the f--king way."

After playing the statement for the jury, it was admitted as substantive evidence. On redirect examination, Mr. Jones admitted that he lied in the statement to the police and that he was trying to "[c]over [his] ass." Mr. Jones further explained that the police had "lied to [him] about what they would give [him] so [he] gave them what they wanted to hear." Mr. Jones also testified that he thought that the police had believed his lies.

During her closing argument, the prosecutor urged the jurors to review Mr. Jones's statement to the police, telling them that the statement was evidence that they could consider and could listen to in the jury room. The prosecutor asked the jury to consider "what happened" to cause Mr. Jones to change his story. The prosecutor then stated that Mr. Jones was "terrified" of the Defendant because the Defendant had "threatened to kill him and his family" and because of "the organization that [the Defendant was] a part of." The prosecutor stated that the murders made "no sense" because Mr. Jones had stolen from the victims numerous times and "never killed them before." The prosecutor then implied that August 16, 2011, was different because the Defendant was present.

During his closing argument, defense counsel stated that Mr. Jones's statement was "not in there as evidence, that's in there to get you upset and not follow your oath." The prosecutor began her rebuttal argument by stating that the statement was evidence that the jury could consider. She then asked what reason Mr. Jones would have to lie and explained that he "told you in the interview, he is terrified of the [D]efendant and the Aryan [C]ircle, that's it."

Mr. Jones's statement to the police was hearsay. Hearsay is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The question of whether a statement fits under one of the exceptions to the hearsay rule is a question of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015).

Tennessee Rule of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement when the statement would be "otherwise admissible under [Tennessee Rule of Evidence] 613(b)" and satisfies the following conditions:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.

(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.

(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

In addressing Rule 613(b), our supreme court has made clear that "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement" because "[t]he unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness [] during trial." State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998). Additionally, the Advisory Commission Comment to Rule 803(26) makes clear that "only prior inconsistent statements, and not consistent statements, are within the ambit of [the] rule."

Mr. Jones was not asked about and did not admit to making most of the statements in the audio recording played for the jury. While not asked about it in reference to the second statement, Mr. Jones had admitted telling the police that it was the Defendant and not him who committed the murders. Likewise, Mr. Jones was not asked about the Defendant's alleged plans to rob a coin store or his alleged connections to drug trafficking. Much of the statement involved Mr. Jones's detailed description of how the Defendant allegedly committed the robbery, murders, and arson. The only thing Mr. Jones was asked about and did not recall telling the police was that he was afraid of the Defendant or "the connections that" the Defendant had.

Nowhere in the statement did Mr. Jones actually state that he was afraid or terrified of the Defendant or the Defendant's "connections." In one instance, Mr. Jones stated that the Defendant threatened to kill him and his family. Mr. Jones said that the Defendant claimed if he could not do it, then he knew "people" that could. Mr. Jones then explained the Defendant's alleged connection to the Aryan Circle. Later, Mr. Jones said the Defendant got "real f--king scary" after finding almost nothing in the safe and safety deposit box. The only portions of Mr. Jones's statement even tangentially related to his denial were brief, approximately a minute in a statement over twenty minutes long. Contrary to the prosecutor's argument at trial, the statement should have been heavily edited to exclude the inadmissible portions of the statement.

Furthermore, the trial court utterly failed in its gatekeeping function as outlined in 803(26). The trial court did not conduct a jury-out hearing and did not question Mr. Jones about the circumstances of his statement. See State v. Charles Jackson and Willis Holloway, No. W2010-01133-CCA-R3-CD, 2012 WL 543047, at *10 (Tenn. Crim. App. Feb. 17, 2012) (where the trial court questioned the witness "extensively during the jury-out hearing about the circumstances in which she gave her statement to the police"). In fact, the trial court did not even listen to the statement before it was played in its entirety to the jury. The trial court made no effort to examine the circumstances under which the statement was made and made no ruling on whether those circumstances indicated trustworthiness.

While Mr. Jones appears to have been interviewed at the police station by at least two detectives, he was a defendant in this case with significant motive to place the blame on his two co-defendants. Mr. Jones testified at trial that his statement contained numerous lies, and he ultimately pled guilty to all of the offenses arising from the victims' murders. Mr. Jones's significant motive when interviewed by the police to place the blame on the Defendant and his subsequent testimony that he lied in his statement do not equate with it having been made under circumstances indicating trustworthiness. See State v. Devonta Amar Cunningham, No. M2012-02203-CCA-R3-CD, 2015 WL 173495, at *13 (Tenn. Crim. App. Jan. 14, 2015) (holding that statement taken at witness' home by police, nine days after the incident, and based on a story made up and "that everyone in the group had agreed to repeat if the police 'ever came questioning,'" was not given under circumstances indicating trustworthiness).

Because the statement was not made under circumstances indicating trustworthiness and Mr. Jones admitted or was not asked about making all but a few brief portions of the statement, it did not meet the requirements for admission under Rule 613(b) and 803(26). As such, we will now examine the error to determine if it was harmless. The applicable analysis is whether, "considering the whole record," the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

While, as discussed below, the evidence against the Defendant was legally sufficient to sustain his convictions, that is not the determinative question for our analysis. See State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (stating that an "inquiry into harmless error does not turn upon the existence of sufficient evidence to affirm the conviction or even a belief that the jury's verdict is correct" but on whether the error "more probably than not had a substantial and injurious impact on the jury's decision making"). Here, the evidence against the Defendant came down to a question of credibility between two co-defendants, Ms. Tanner testifying for the State and Mr. Jones testifying on behalf of the Defendant.

In light of the importance of the credibility of the testifying co-defendants, Mr. Jones's statement was highly prejudicial. The statement's focus was Mr. Jones's detailed description of how the Defendant had committed these brutal crimes. At one point, Mr. Jones began to cry at how he did nothing while the Defendant allegedly beat Mr. Marsh with the roofing hatchet. However, both Ms. Tanner and Mr. Jones testified at trial that Mr. Jones had actually committed the murders. The statement also contained extremely prejudicial references to the Defendant participating in drug trafficking and planning to commit a different robbery with another Aryan Circle member. At one point, the detectives sympathized with Mr. Jones, stating that the Defendant did not seem like the type of person Mr. Jones would "hook up with" because Mr. Jones was not a killer.

The prosecutor then relied heavily on the statement during her closing argument, repeatedly instructing the jury that the whole statement was evidence for it to consider during deliberations. The prosecutor also specifically urged the jury to listen to the statement again when it deliberated. Despite the fact that nowhere in the statement did Mr. Jones claim to be afraid of the Defendant, the prosecutor argued that the statement showed that Mr. Jones was lying at trial because he was "terrified" of the Defendant because the Defendant had "threatened to kill him and his family" and because of his Aryan Circle ties. Under these circumstances, we conclude that the error in admitting the statement was not harmless and entitles the Defendant to a new trial.

On remand, Mr. Jones's prior statement is inadmissible as substantive evidence pursuant to Rule 803(26) as we have found it not to have been made under circumstances indicating trustworthiness. With respect to Rule 613(b), the statement will be inadmissible should Mr. Jones unequivocally admit to having made it. See Martin, 964 S.W.2d at 567. Rule 613(b) will only be applicable if Mr. Jones denies making the statement or testifies that he does not remember making the statement. Furthermore, only the portions of the statement that Mr. Jones denies making or cannot recall making would be admissible under Rule 613(b). See id.

Portions of the statement regarding the Defendant's alleged plans to rob a coin store or connections to drug trafficking would be inadmissible and should be redacted from any portions of the statement sought to be admitted as extrinsic impeachment evidence. See Tenn. R. Evid. 404(b). Only after limiting the statement to the portions that Mr. Jones has denied making or cannot recall making and redacting any improper propensity evidence from the statement may the trial court admit portions of the statement solely for use as extrinsic impeachment evidence under Rule 613(b).

### B. Aggravated Arson Convictions

The Defendant contends that the trial court erred by failing to merge all of his convictions for aggravated arson. The Defendant argues that he could only be convicted

of one count of aggravated arson because "there was only one structure, the [victims'] home," burned and that all of the "personal property and people present" were inside the home. The State responds that merger of the convictions was not warranted in this case "because each offense contained an element that the other did not."

With respect to the aggravated arson charges, the Defendant was indicted as follows:

> Count 17: That the Defendant "did knowingly damage, by fire a structure of Eric Marsh without the consent of all persons having a possessory and proprietary interest in said structure, and a person, to-wit: Dena Marsh, did suffer serious bodily injury as a result of said fire, in violation of T.C.A. 39-14-302[.]"

> Count 18: That the Defendant "did knowingly damage, by fire a structure of Eric Marsh without the consent of all persons having a possessory and proprietary interest in said structure, and a person, to wit: Eric Marsh, did suffer serious bodily injury as a result of said fire, in violation of T.C.A. 39-14-302[.]"

> Count 19: That the Defendant "did knowingly damage, by fire other property of Eric Marsh with the intent . . . to damage and destroy said other property for an unlawful purpose, at a time when one or more persons were present therein said other property, in violation of T.C.A. 39-14-302[.]"

At the Defendant's sentencing hearing, the prosecutor argued that Counts 17 and 18 should not be merged. The prosecutor recognized that both counts involved "the same act of setting the fire, but [involved] two different victims." With respect to Count 19, the prosecutor stated that she thought it would merge into Count 18 because those counts involved "the same victim," Mr. Marsh. The prosecutor also stated that she "did not do any research" on the issue.

Defense counsel argued that the aggravated arson convictions should all have been merged into one conviction because there was only one fire. The trial court stated defense counsel "may be correct" as there was only "one aggravated arson in fact . . . although there were different victims." Despite acknowledging that defense counsel's argument was possibly correct, the trial court did not merge Counts 17 and 18. The trial court did merge Count 19 into Count 18.

During the motion for new trial hearing, the prosecutor, in addressing another issue, explained how she believed the aggravated arson counts were charged in the indictment. She stated that the indictment "didn't just charge it generally, aggravated

arson of persons present." Instead, she argued, the indictment "charged it specifically with Mr. Marsh being alive and present when the structure was on fire" and "with Ms. Marsh being alive and present when the structure was on fire."

On appeal, the Defendant argues that he should have only been convicted of one count of aggravated arson because there was only one structure burned, citing to State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997), which held that the term "structure" was "indivisible for purposes of the arson statutes" and allowed for only one conviction arising from the burning of five apartments contained within a single structure.

On appeal, the State now responds that Count 17 indicted the Defendant for "the aggravated arson of Mr. Marsh," that Count 18 similarly indicted the Defendant for "the aggravated arson of [Ms.] Marsh," and that only Count 19 indicted the Defendant for "the aggravated arson of [the victims'] residence." The State further responds that Lewis does not apply to the Defendant's case "because his case does not involve the destruction of multiple buildings." We do not see the basis for such an argument in light of the plain language of the arson statutes and applicable case law.

The arson statutes are found in Chapter 14 of the criminal statutes, titled Offenses Against Property. As applicable to our review, the offense of arson occurs when a person "knowingly damages any structure by means of fire or explosion . . . [w]ithout the consent of all persons who have a possessory, proprietary, or security interest therein." Tenn. Code Ann. § 39-14-301(a)(1). Also, as applicable to our review, it is an offense for a person to "knowingly damage any personal property, land, or other property, except buildings or structures covered under § 39-14-301, by means of fire or explosion . . . [w]ith intent to destroy or damage any such property for any unlawful purpose." Tenn. Code Ann. § 39-14-303(a)(2) (emphasis added). Aggravated arson occurs when a person "commits arson as defined in § 39-14-301 or § 39-14-303: (1) When one (1) or more persons are present therein; or (2) When any person . . . suffers serious bodily injury as a result of the fire or explosion." Tenn. Code Ann. § 39-14-302(a) (emphasis added).

As our supreme court has explained, the aggravated arson statute "does not permit multiple convictions in spite of the fact that multiple persons were victimized by the fire." State v. Lewis, 44 S.W.3d 501, 508 (Tenn. 2001); see also State v. Imfeld, 70 S.W.3d 698, 705-06 (Tenn. 2002) (noting that the arson statutes do not provide for separate convictions "based upon specific, named victims"). Contrary to the State's arguments, arson offenses are confined to the burning of structures or property and do not apply to the burning of a person. Cf. State v. Brian Montrel Brawner, et al., No. W2010-02591-CCA-R3-CD, 2012 WL 1572212, at *9-10 (Tenn. Crim. App. May 3, 2012), perm. app. denied (Tenn. Sept. 18, 2012); State v. Courtenay Darrell Robertson, No. W2009-01853-CCA-R3-CD, 2010 WL 4812774, at *5-6 (Tenn. Crim. App. Nov. 18, 2010) (both upholding convictions for aggravated arson where the defendant set fire to

the personal property of the victim, that property being the clothing worn by the victim at the time of the fire).

Here, the State's argument on appeal that Counts 17 and 18 reflected the arson of Mr. and Ms. Marsh's persons is a gross misinterpretation of the arson statutes. Likewise, the prosecutor's argument at the sentencing and motion for new trial hearings that there could be multiple convictions for the arson of the victims' house because there were multiple victims inside the house was in direct contradiction of the plain language of the aggravated arson statute and of our supreme court's opinions in the Lewis cases. Accordingly, we hold that the trial court erred in refusing to merge Counts 17 and 18. Should the Defendant be convicted on retrial of Counts 17 and 18, the trial court is instructed to merge the convictions.

With respect to Count 19,[6] it charged the Defendant with knowingly damaging by fire other property of Eric Marsh with the intent to destroy or damage the property for an unlawful purpose pursuant to Tennessee Code Annotated section 39-14-303(a)(2). The indictment elevated the offense to aggravated arson by alleging that "one or more persons were present therein said other property" at the time of the fire. Tenn. Code Ann. § 39-14-302(a)(1). As such, the trial court instructed the jury with respect to Count 19 that the State was required to establish beyond a reasonable doubt as follows:

> (1) that the defendant knowingly damaged by fire or explosion any personal property, or property other than buildings or structures; and
> (2) that the defendant did so with intent to destroy or damage the said property for an unlawful purpose; and
> (3) that one or more persons were present therein.

Based upon the indictment and jury instruction for Count 19, the State was required to prove that the Defendant damaged by fire personal property belonging to Mr. Marsh other than the victims' house, that the Defendant did so with the intent to destroy or damage the property for an unlawful purpose, and that one or more persons were present inside the personal property. See Black's Law Dictionary 1517 (8th ed. 2004) (defining "therein" "[i]nside or within that thing"). Based upon the evidence adduced at trial, the only personal property belonging to Mr. Marsh that was set on fire was the property inside the victims' house.

It is arguable that the State established that this property was burned with the intent to destroy or damage it for an unlawful purpose given that it was within the house at the time the house was set on fire, and the only evidence of use of an accelerant at trial

---

[6] While the trial court merged the conviction in Count 19 into Count 18, we will examine Count 19 because the case is being remanded for a new trial.

dealt with the house, not the property therein. However, it is clear from the record that the victims were inside the house and not some other form of property at the time the fire was started. As such, they were not "present therein" the personal property at issue in Count 19. The factual scenario alleged in Count 19 would justify an aggravated arson conviction when a defendant set fire to some form of personal property that could contain a person, for example, setting fire to a car while a person was inside, but that was not the case here. Accordingly, we conclude that the State failed to prove an essential element of Count 19, that there was a person "present therein" the personal property burned. Therefore, we reverse the Defendant's conviction and dismiss Count 19.

## II. Defendant's Remaining Issues

### A. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant does not challenge the sufficiency with respect to a specific offense or the applicability of the criminal responsibility statute to his convictions. See Tenn. Code Ann. § 39-11-402. Rather, the Defendant argues that the evidence was insufficient because there was no forensic evidence linking him to the crimes, that Ms. Tanner was not credible, and that her testimony should not have outweighed the testimony of the defense witnesses. The State responds that the evidence was sufficient to sustain the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out

every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (internal quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Here, the jury was presented with two plausible theories based upon the competing testimony of co-defendants Ms. Tanner and Mr. Jones. Ms. Tanner testified that the Defendant participated in the offenses and shared in their proceeds. Contrary to the Defendant's argument in his brief, there was forensic evidence linking him to the crimes, his fingerprints were found on the shotgun taken from the victims' home. Mr. Jones testified on the Defendant's behalf that the Defendant had no knowledge of the plan to rob the victims, never entered the house, and did not share in the proceeds of the crimes. The fact that the jury accredited Ms. Tanner's testimony and chose not to believe the testimony of Mr. Jones and Mr. Cox "does not cause its verdict to be suspect." State v. Leath, 461 S.W.3d 73, 104 (Tenn. Crim. App. 2013). Questions regarding the credibility of the witnesses are the province of the jury, and will not be revisited by this court. Bland, 958 S.W.2d at 659. Accordingly, the Defendant's argument with respect to this issue is without merit.

### B. Stipulation of the Defendant's Prior Convictions

The Defendant contends that the trial court erred by not allowing him to stipulate that he had been convicted of prior felonies without disclosing that the convictions were for crimes of force and violence. The Defendant argues that it was "extremely prejudicial

to tell [the] jury that he was convicted before for crimes of violence and force" and that he was faced with an impossible choice between accepting the State's offer that he stipulate to having prior felony convictions involving violence and force or having the State prove the same with certified copies of his prior convictions. The State responds that the fact that the Defendant had prior felony convictions for crimes of violence and force were essential elements of the unlawful possession of a firearm charges in Counts 20 and 21. As such, the State concludes, the trial court did not err in accepting the Defendant's stipulation that stated he had been convicted of felonies involving crimes of violence and force but not naming the offenses.

The Defendant was charged in Count 20 with unlawful possession of a firearm "having been convicted of a felony involving the use of violence," specifically aggravated robbery. In Count 21, the Defendant was charged with unlawful possession of a firearm "having been convicted of a felony involving the use of force," specifically aggravated burglary.

Prior to trial, defense counsel requested that the trial court bifurcate Counts 20 and 21, which the trial court ultimately rejected. Defense counsel then requested that the Defendant be allowed to stipulate merely to the fact that he was a convicted felon. The trial court rejected this request citing the fact that the felony involved force or violence was an essential element of the offense. Defense counsel then requested that the Defendant be allowed to stipulate only to having committed a felony involving force. The trial court rejected this request because Count 20 specifically listed "the use of violence."

The Defendant objected to having to choose between the stipulation proposed by the State and having the State enter certified copies of his prior convictions into evidence at trial. Prior to the conclusion of the trial, a stipulation between the Defendant and the State was entered into evidence stating that the Defendant had "a previous felony conviction involving force" and "a previous felony conviction involving violence."

As pertinent to our review, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon." There is no dispute that the Defendant's prior convictions for aggravated robbery and aggravated burglary qualify as felony convictions involving the use of violence and force, respectively.

At the outset, we note that the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings and address the unlawful possession of

a firearm charge separately. See e.g., State v. Taft Arkey Murphy, No. M2007-00403-CCA-R3-CD, 2008 WL 4735494 (Tenn. Crim. App. Oct. 27, 2008); State v. Alonzo Maurice Rogan, No. M2002-01603-CCA-R3-CD, 2004 WL 112864 (Tenn. Crim. App. Jan. 22, 2004) (both cases where trial courts bifurcated the unlawful possession of a firearm charge from the remaining charges).

With respect to status offenses, like the unlawful possession of a firearm offenses at issue here, it is well established that "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." State v. James, 81 S.W.3d 751, 760-61 (Tenn. 2002). In the limited circumstance that the defendant offers to stipulate the applicable status, the probative value of evidence of the defendant's prior convictions is, "as a matter of law, outweighed by the risk of unfair prejudice." Id. at 762. In such circumstances, the trial court should accept "the defendant's stipulation in lieu of disclosing the names or nature of his previous convictions." Id.

However, "a defendant can offer to stipulate to the elements of an offense, but by doing so cannot prevent the jury from learning of an element of the offense or the stipulation." State v. Marvin Senathan Hall, Jr., No. W2008-00933-CCA-R3-CD, 2009 WL 1643435, at *8 (Tenn. Crim. App. June 12, 2009), perm. app. denied (Tenn. Nov. 30, 2009). Here, "the State had to prove that the [D]efendant had previously been convicted of not just a felony," but crimes of violence and force, as charged in Counts 20 and 21. Id. The Defendant's proposed stipulations that he was a convicted felon and that he had only committed a felony involving force "did not encompass the elements the State had to prove, which would have left the jury with a lack of coherence as to the offense." Id. Accordingly, we conclude that the trial court did not err in accepting the stipulation eventually agreed to by the State and the Defendant.

*C. Admission of Autopsy Photograph*

The Defendant contends that the trial court erred by admitting an autopsy photograph of the charred body of Ms. Marsh. The Defendant argues that the picture was not relevant and extremely prejudicial because it depicted injuries that occurred after the victim's death. The State responds that the picture was relevant "because it showed a 'pugilistic pose,' provided a spatial context of where [Ms.] Marsh was when she died, and indicated that she was alive during the fire."

Prior to the testimony of Dr. Lochmuller, the trial court held a jury-out hearing to determine the admissibility of several autopsy photographs. In reference to the picture at issue on appeal, the trial court stated that it showed "what happens in reaction" to a fire "[i]f you're alive." The trial court further stated that the picture was "extraordinarily prejudicial," but that it was probative for "determining whether or not the individual was

-28-

alive, whether or not we have especially aggravated robbery, especially aggravated . . . arson." The trial court also stated that the photograph was relevant to establish "the manner of death."

During Dr. Lochmuller's testimony, the picture was admitted into evidence. The picture showed Ms. Marsh's burned torso, arms, and face. The face was completely charred and only the top row of Ms. Marsh's teeth and her tongue, protruding from the mouth and greyed from the thermal injuries, were recognizable. Ms. Marsh's shoulders were hunched forward, her arms were flexed at the elbows, and her hands had clenched into fists. Ms. Marsh's left arm had broken leaving her radius and ulna bones exposed in the picture.

Dr. Lochmuller testified that the broken bones were thermal injuries caused by the intensity of the fire and not "something that occurred during life, this [was] something that occurred after death because of the fire." Dr. Lochmuller then explained that a "pugilistic pose" was caused by the muscles dehydrating during the fire and causing the shoulders, arms, and hands to flex into "kind of a crouched boxer's pose." Dr. Lochmuller testified that the pose would "depend on the positioning of the body as it was laying [sic] . . . in the house fire, but her positioning here is fixed because of the . . . thermal injury." That was the extent of Dr. Lochmuller's testimony regarding the picture. He did not refer to the picture or the "pugilistic pose" in making his determination that Ms. Marsh was still alive at the time the fire was started or explain how the position of her body affected the injuries depicted in the picture.

During the motion for new trial hearing, the prosecutor argued that the Defendant had been charged with aggravated arson with respect to individual victims rather than "generally, aggravated arson of persons present"; therefore, the photograph was relevant to establish that Ms. Marsh was alive at the time the fire was started. In denying the motion for new trial, the trial court stated that the photograph was "very gruesome" and that Dr. Lochmuller had testified that the injuries depicted in the photograph "would have occurred after the death . . . of the victim." However, the trial court ultimately found the photograph to be relevant.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. "Unfair prejudice" is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951.

Tennessee courts follow a liberal policy in the admission of photographs in both civil and criminal cases.  Banks, 564 S.W.2d at 949.  As such, whether to admit a photograph rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion.  Id.; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and probative value is not [substantially] outweighed by their prejudicial effect."  State v. Brock, 327 S.W.3d 645, 694 (Tenn. Crim. App. 2009).  Autopsy photographs, in particular, must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case.  Banks, 564 S.W.2d at 951. Additionally, this court has held that "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used."  State v. Derek Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011).

The photograph at issue was not relevant to any material aspect of the case.  As charged in Counts 17 and 18, the aggravated arson statute required proof that "any person" suffered "serious bodily injury as a result of the fire."  Tenn. Code Ann. § 39-14-302(a)(2) (emphasis added).  As such, the requirements for aggravated arson were satisfied when Dr. Lochmuller testified that Mr. Marsh died as a result of the fire. Furthermore, Dr. Lochmuller specifically testified that the injury to Ms. Marsh's left arm occurred after her death.

Dr. Lochmuller did not specifically testify as to whether any of the other injuries depicted in the photograph occurred before or after Ms. Marsh's death.  Nor did he testify as to how the injuries depicted in the photograph "provided a spatial context of where [Ms.] Marsh was when she died."  Dr. Lochmuller did not rely on the photograph or any of the injuries depicted therein when he determined that Ms. Marsh was alive at the time the fire was started.  Instead, he referred to the soot found in her nostrils and lungs as well as the carbon monoxide in her blood.  Accordingly, we conclude that the trial court abused its discretion in admitting the photograph as it had little probative value and was highly prejudicial.

However, there were several other graphic and gruesome autopsy photographs admitted during the trial which the Defendant did not object to or challenge on appeal.  A photograph of Ms. Marsh's body as it was discovered in the back bedroom was admitted during Ms. Wieberg's testimony.  During Dr. Lochmuller's testimony several photographs of Ms. Marsh's head with the scalp cut open and peeled back to show the fractures to her skull were admitted into evidence.  Mr. Marsh suffered similar injures,

but similar photographs were not admitted during Dr. Lochmuller's testimony regarding his autopsy. Additionally, several of the photographs of Ms. Marsh's head injuries showed significant charring to her head and arms.

As such, we conclude that the trial court's error in admitting the irrelevant photograph was harmless in light of the photographs admitted to show the crime scene and to assist Dr. Lochmuller in his testimony. See Tenn. R. App. P. 36(b) (providing that a "final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process").

### D. Vouching for Ms. Tanner's Credibility

The Defendant contends that the State improperly vouched for the credibility of Ms. Tanner. The Defendant argues that the prosecutor improperly vouched for Ms. Tanner's credibility during closing arguments by stating that the jury needed to look at "who [had] personal knowledge" of the offenses and that the jury had to decide if it believed Mr. Jones or Ms. Tanner's testimony. The Defendant further argues that the prosecutor, by asking Ms. Tanner about her plea agreement with the State, intended "to gain advantage of the State's unique and exclusive position regarding offers and consideration related to them regarding testifying co-defendants." The State responds that the Defendant has waived this issue by failing to contemporaneously object to the alleged misconduct.

At the start of her direct examination, the following exchange occurred between the prosecutor and Ms. Tanner:

[Prosecutor]: Have I extended an offer to your lawyer?
[Ms. Tanner]: Yes, ma'am
[Prosecutor]: What offer did I extend to your lawyer?
[Ms. Tanner]: [Twenty-five] years at [thirty] percent.
[Prosecutor]: In exchange for what?
[Ms. Tanner]: My truthful testimony
[Prosecutor]: Have I told you what to say?
[Ms. Tanner]: No, ma'am.
[Prosecutor]: If you do not tell the truth, then do we have a resolution of your case?
[Ms. Tanner]: I don't understand.
[Prosecutor]: Okay. What happens if you don't tell the truth?
[Ms. Tanner]: I don't get the deal.

-31-

[Prosecutor]: And so, you understand that you've got to testify truthfully today?

[Ms. Tanner]: Yes, ma'am.

During cross-examination, defense counsel asked Ms. Tanner about her plea agreement, and the following exchange occurred:

[Defense counsel]: And you were to testify, right?

[Ms. Tanner]: Yes, sir.

[Defense counsel]: What if you came in and said [the Defendant] wasn't even there? What do you think the State would do?

[Ms. Tanner]: Take my deal back from me.

[Defense counsel]: Right. You're here to get [the Defendant], right?

[Ms. Tanner]: I'm just here to give my testimony for the State.

On redirect examination, the prosecutor asked Ms. Tanner if what she had testified to was the truth, and Ms. Tanner responded that it was. The prosecutor then questioned Ms. Tanner as follows:

[Prosecutor]: Remind this [j]ury what happens if you lie?

[Ms. Tanner]: I lose my deal.

[Prosecutor]: Now - - and I want to be clear about this. Have I ever sat down and talked to you?

[Ms. Tanner]: No.

[Prosecutor]: Have I ever, besides being in [c]ourt, met you?

[Ms. Tanner]: No, ma'am.

[Prosecutor]: And I want to be clear. Was our deal for you to testify as to what you told the police?

[Ms. Tanner]: It was the truth, just the truthful testimony.

[Prosecutor]: The truthful testimony. Whether that was what you told the police that night, we wanted you to tell the truth right?

[Ms. Tanner]: Yes, ma'am

[Prosecutor]: Is that an incentive for you to tell the truth?

[Ms. Tanner]: Yes.

[Prosecutor]: Because if you don't, if you get caught in a lie, what happens?

[Ms. Tanner]: And I don't - - I lose the deal. I don't know what happens to me then.

During her closing argument, the prosecutor told the jury that "what you've gotta do in order to find out what took place inside of that home, you've gotta talk to the folks who have personal knowledge about what went on inside of that home." The prosecutor

-32-

then discussed Ms. Tanner's testimony and compared it to Mr. Jones's testimony. The prosecutor stated that the jury had "to decide which of their statements" it believed. During his closing argument, defense counsel heavily attacked Ms. Tanner's credibility and characterized her as a liar. Defense counsel asked the jury, "if [Ms. Tanner has] lied to all these people on small stuff, what is she capable of doing to save herself from" a life sentence.

Closing arguments "have special importance in the adversarial process," and the parties "have an ancient right to make closing arguments." State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). Closing arguments allow the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. Attorneys "should be given great latitude in both the style and the substance of their arguments." Id. at 131. This leeway often results in closing arguments in criminal cases having a "rough and tumble quality" to them. Id. (quoting State v. Skakel, 888 A.2d 985, 1060-61 (Conn. 2006)). However, while attorneys "may strike hard blows, . . . [they are] not at liberty to strike foul ones." Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

"[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131. This court has found five general areas of prosecutorial misconduct with respect to closing arguments, the only one of which at issue in this case is that it "is unprofessional conduct for the prosecutor to express [her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

Elaborating on this particular type of prosecutorial misconduct, our court noted that "[e]xpressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which [she] argues." Goltz, 111 S.W.3d at 6 (citing Standards § 5.8(b) Commentary b). The "witnesses must stand on their own," and this prohibition "prevents the advocate from personally endorsing or vouching for" a witness, ensuring that "the cause . . . turn[s] on the evidence, not on the standing of the advocate." Id.

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. In reviewing the propriety of a prosecutor's closing argument, this court considers:

-33-

(1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

Id.

The statements of the prosecutor highlighted by the Defendant in his brief did not amount to an improper comment on the credibility of the witnesses. Rather, the prosecutor stated the simple fact that the only way "to find out what took place inside of that home" would be to look at the testimony of the two witnesses who had "personal knowledge about what went on inside of that home." The prosecutor then went on to compare the testimony of the two co-defendants before stating, correctly, that the case would turn on which of the two co-defendants the jury believed. Defense counsel raised the same points during his closing argument and heavily attacked Ms. Tanner's credibility. The prosecutor's closing argument on this issue was not so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice.

More troubling was the prosecutor's questioning of Ms. Tanner about her plea agreement with the State. Generally, a prosecutor may "refer to the plea agreement of a testifying witness" and "elicit testimony about its terms." United States v. Francis, 170 F.3d 546, 550 (6th Cir. 1999). However, when the prosecutor makes statements that the witness' plea agreement "would be in jeopardy" if "the government or the judge did not believe that the [witness was] being truthful" such statements imply to the jury "that the government and the court [are] satisfied that the [witness was] truthful." United States v. Carroll, 26 F.3d 1380, 1389 (6th Cir. 1994). These types of statements place "the prestige of the government, and even of the court, behind the credibility of" the witness and "'inevitably give jurors the impression that the prosecutor is carefully monitoring the testimony of the cooperating witness to make sure that the latter is not stretching the facts—something the prosecutor usually is quite unable to do.'" Id. at 1388-89 (quoting United States v. Arroyo-Angulo, 580 F.2d 1137, 1150 (2d. Cir. 1978) (Friendly, J., concurring)).

Here, the prosecutor repeatedly asked Ms. Tanner about what would happen if she testified untruthfully, and Ms. Tanner responded every time that she would "lose [her] deal." This line of questioning implied that the prosecutor was in a special position to judge the truthfulness of Ms. Tanner's testimony and that, having satisfied the prosecutor with the truthfulness of her testimony, Ms. Tanner would ultimately receive her plea agreement. The prosecutor compounded this error by asking Ms. Tanner if the threat of having her plea agreement revoked was "an incentive . . . to tell the truth." Ms. Tanner responded that it was and later said that she did not know what would happen to

her if her plea agreement was withdrawn. Taken as a whole, this implied to the jury that the prosecutor was satisfied with the truthfulness of Ms. Tanner's testimony and constituted improper vouching.

However, the Defendant did not object to these questions at trial and did not raise this issue in his motion for new trial. See Tenn. R. App. P. 3(e), 36(a) (stating that full appellate review is waived when a party fails to contemporaneously object to an error or raise it in a motion for new trial). As such, this error would be reversible only if it rises to the level of plain error. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, the error does not constitute plain error because the Defendant has failed to show that he did not waive the issue for tactical reasons. Page, 184 S.W.3d at 230. Defense counsel used the threat of Ms. Tanner's deal being withdrawn to impeach her on cross-examination. Defense counsel asked Ms. Tanner what the State would do if she testified that the Defendant was not present at the offenses, and she responded that they would withdraw her plea agreement. During his closing argument, defense counsel characterized Ms. Tanner as a liar and asked the jury to think about what Ms. Tanner was capable of doing in order to avoid a life sentence. All of this is consistent with a tactical decision to waive the issue in order to use it to attack Ms. Tanner's credibility. Accordingly, we conclude that the error does not rise to the level of plain error.

*E. Jury Instruction Regarding Possession of Recently Stolen Property*

The Defendant contends that the trial court erred by instructing the jury regarding the inferences that could be drawn from the possession of recently stolen property. The Defendant argues that the instruction was not warranted "given the contested facts of this case." The State responds that the instruction was warranted because "there was a rational connection between the possession of the stolen property and the [D]efendant's participation in the robbery."

Over the Defendant's objection, the trial court instructed the jury as follows:

If you find beyond a reasonable doubt from the evidence that the property in question had been recently stolen and that soon thereafter the same property was discovered in the exclusive possession of the defendant or the defendant was in joint possession of the stolen property, this possession, unless satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw an inference that the defendant gained possession through theft.

Furthermore, if you find beyond a reasonable doubt from the evidence that the defendant gained possession of the property in question through theft, . . . and you also find beyond a reasonable doubt that the theft could only have been accomplished through robbery, you may also reasonably draw an inference that the defendant committed such offense, if this inference is substantiated by facts and circumstances which corroborate that the defendant actually committed the robbery and was not merely a possessor of stolen property. This corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. As corroboration, you may consider the attributes of possession – time, place, and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, or any other evidence which tends to connect the defendant with the crime charged.

However, you are never required to make this inference. It is for you to determine whether the facts and circumstances shown by the evidence in this case warrant any inference which the law permits you to draw from the possession of recently stolen property.

When the evidence is offered that the defendant was in possession of recently stolen property, the defendant has a right to introduce evidence that he came into possession of the property lawfully, or possession may be satisfactorily explained through other circumstances or other evidence, independent of any testimony or evidence offered by the defendant.

In considering whether possession of recently stolen property has been satisfactorily explained, you are reminded that in the exercise of constitutional rights, the accused need not take the witness stand to testify.

The term "recently" is a relative term and has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property and all the facts and circumstances shown by the

-36-

evidence in the case. The longer the period of time since the theft, the more doubtful becomes the inference which may be drawn from unexplained possession.

The correctness of the inference and the weight to be given any explanation that may be shown by the evidence are matters that must be determined by you, and you are not bound to accept either. You must weigh all the evidence presented as to the defendant's alleged possession of the property in question and decide in the light of all the facts and circumstances present whether any inference is warranted. You are reminded that the burden of proving the defendant's guilt beyond a reasonable doubt remains on the State.

The trial court also instructed the jury, generally, that it was "not required to make" any inferences and that it was "the exclusive province of the Jury to determine whether the facts and circumstances shown by all the evidence in the case" warranted the inference.

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." State v. Brooks, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. Id. (citing State v. Guy, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." Id. (citing State v. Dellinger, 79 S.W.3d 458, 502 (Tenn. 2002)). On appellate review, an erroneous jury instruction will result in a reversal only where it "so infected the entire trial that the resulting conviction violates due process." State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008) (quoting Cupp v. Naughten, 414 U.S. 141 (1973)) (internal quotation marks omitted).

Our supreme court has upheld jury instructions stating that possession of recently stolen property, unless satisfactorily explained, creates a permissible inference that the possessor committed the theft. State v. James, 315 S.W.3d 440, 450-51 (Tenn. 2010). Our supreme court noted that such "[i]nferences from recently stolen property have a long history and widespread acceptance." Id. at 448 n.5. Additionally, our supreme court has held that a jury may "infer a burglary from possession of recently stolen property only when there exists a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." Id. at 452. In doing so, our supreme court cited with approval a selection from the California Pattern Instructions "which can apply equally to theft, burglary, or robbery." Id. at 454 n.13. Likewise, this court has previously held that a robbery could

be inferred from possession of recently stolen property. <u>Raynor v. State</u>, 447 S.W.2d 391, 393 (Tenn. Crim. App. 1969).

Here, the evidence at trial established that the Defendant and Ms. Tanner were arrested two days after the murders with Mr. Marsh's shotgun in the back of the Defendant's Ford Explorer. Later testing revealed the Defendant's fingerprints on the shotgun. Police also found Ms. Marsh's jewelry and jewelry boxes at the home where the Defendant and Ms. Tanner lived. Ms. Tanner and Mr. Jones both testified at trial that the property was taken from the victims during a robbery. Ms. Tanner further testified that the Defendant participated in the robbery, removing items from the victims' house, and that he intended to sell the shotgun. Additionally, the trial court instructed the jury that it was not required to make the inference, recognized the Defendant's right not to testify at trial, and emphasized that the burden was on the State to prove the Defendant's guilt beyond a reasonable doubt. <u>See</u> <u>James</u>, 315 S.W.3d at 454. Accordingly, we conclude that the trial court did not err in instructing the jury regarding the inferences that could be drawn from the possession of recently stolen property.

*F. Consecutive Sentencing*

The Defendant contends that the trial court erred by imposing partial consecutive sentences. The Defendant's sole argument with respect to this issue is that his total effective sentence of two consecutive life sentences plus 105 years was not the least severe measure necessary to achieve the purposes for which the sentence was imposed. The State responds that the trial court did not abuse its discretion when it imposed partial consecutive sentences because the Defendant had an extensive criminal record and was on probation at the time of the offense.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies" and gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." <u>State v. Pollard</u>, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." <u>Id.</u> at 862 (citing <u>State v. Dickson</u>, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive, that he was a dangerous offender, and that he committed these offenses while on probation. <u>See</u> Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). It was undisputed that the Defendant was on probation for a DUI conviction when he committed these offenses. It was also established that in addition to the DUI conviction, the Defendant had prior convictions for aggravated robbery, aggravated burglary, theft,

assault, casual possession, and possession of drug paraphernalia. The Defendant also had an extensive history of probation violations and disciplinary infractions while he was incarcerated. Accordingly, the trial court was justified in imposing consecutive sentences in this case.[7]

With respect to the Defendant's argument that his total effective sentence was excessive and not the least severe measure necessary to achieve the purposes for which the sentence was imposed, we note that the evidence at trial established that both of the victims were beaten so severely with a roofing hatchet that they suffered depressed skull fractures. The victims' home was then set on fire while the Defendant and his co-defendants left them inside, unable to escape. Both victims died from a combination of blunt force injuries and "inhalation of products of combustion." Ms. Marsh's body, when it was recovered, was covered in third degree burns and "charring injuries." According to Ms. Tanner's testimony, the Defendant and his co-defendants did this for a shotgun, some jewelry, pain medication, and a safe, which ultimately had nothing of value in it. Given the foregoing, we cannot conclude that the Defendant's total effective sentence was excessive in light of the committed offenses. Therefore, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentences.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are reversed, and this case is remanded to the trial court for a new trial consistent with this opinion. Additionally, the judgment of the trial court with respect to Count 19, aggravated arson, is reversed for insufficiency of the convicting evidence and dismissed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[7] Because only one of the grounds listed in section 40-35-115(b) is needed to justify consecutive sentencing, we need not determine whether the trial court properly concluded that the Defendant was a dangerous offender.