IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 25, 2020

**STATE OF TENNESSEE v. CURTIS DEWAYNE BROWN**

**Appeal from the Criminal Court for Hamilton County**
**No. 300663   Thomas C. Greenholtz, Judge**

_____

**No. E2019-02052-CCA-R3-CD**
_____

A Hamilton County Criminal Court Jury found the Appellant, Curtis Dewayne Brown, guilty of two counts of attempted voluntary manslaughter, two counts of aggravated assault, employment of a firearm during a dangerous offense, and possession of a firearm while having a prior violent felony conviction.  On appeal, the Appellant contends that (1) the evidence was not sufficient to sustain his convictions; (2) the trial court erred by not allowing him to impeach Officer Downs with her preliminary hearing testimony regarding the number of muzzle flashes she saw; (3) the trial court erred by allowing the State to introduce proof of the Appellant's prior conviction of aggravated assault during the bifurcated proceeding on count six; and (4) the trial court erred in imposing consecutive sentencing.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

John G. McDougal, Chattanooga, Tennessee, for the Appellant, Curtis Dewayne Brown.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Leslie Longshore, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Appellant was charged with the attempted first degree murder of two Chattanooga police officers, Kelly Downs and Stephen Huckabee; the aggravated assault

of Officer Downs and Officer Huckabee; employment of a firearm during a dangerous offense; and possession of a firearm while having a prior violent felony conviction. The charges arose from a shooting involving Officer Downs, Officer Huckabee, and the Appellant on the night of July 11, 2016.

At trial, Officer Kelly Downs testified that on the night of July 11, 2016, she was working second shift from 3:00 p.m. to 1:00 a.m. She was dressed in her uniform and driving a marked patrol car. As a result of a call to police, she was dispatched to Sandy's Mini Mart to investigate a report of "a disorder, guys with guns." She was given the following detailed description of one of the suspects: "a black male, tall slender male, low haircut, black shirt, black shorts[,] . . . he has a gun, and facial hair[, namely a goatee]."

Officer Downs said that she arrived at Sandy's Mini Mart less than five minutes after being dispatched and parked on the east side of the parking lot behind a gold sedan. The suspect, whom Officer Downs identified in court as the Appellant, was standing beside the gold sedan and talking with the driver, who was inside the vehicle. Officer Downs rolled down her window and repeatedly told the Appellant to "come here." She opened her car door and stood behind it in the event the Appellant had a weapon. The Appellant did not obey her commands to approach. He occasionally looked at her, but he did not say anything and turned back around and resumed talking with the driver of the gold sedan. Officer Downs continued to tell the Appellant to "come here" to no avail. Instead, the Appellant started grabbing at and holding onto his waistband.

Officer Downs said that the Appellant's demeanor made her nervous, explaining that based on the description of the suspect she was given and the gestures the Appellant was making, she believed the Appellant had a firearm on his person. She further explained, "A lot of times when people carry a weapon on their person without a holster, they have to hold onto it, . . . guns are heavy, . . . it's hard for them to sit there and not fall down." Officer Downs did not want to approach the Appellant; instead, she wanted the Appellant to approach her with his hands up. The Appellant did not speak to her but continued to glance at her and look away. When Officer Huckabee drove up and parked his vehicle, the Appellant began to back away from the gold sedan. Officer Downs believed that the Appellant was preparing to run. She got back into her vehicle, closed the door, and rolled up her windows. Officer Downs kept her hand on her gun because she thought the Appellant had a weapon. The Appellant looked at Officer Huckabee and "t[ook] off running." Officer Downs got out of her vehicle, drew her weapon, and ran after the Appellant. The Appellant ran along the front of the mini mart, and Officer Downs and Officer Huckabee pursued him on Latta Street.

Officer Downs said that when the Appellant approached the corner of the mini mart, the Appellant "trip[ped]" and "f[ell] kind of on the corner of the [mini mart] on Latta street, there is like a little embankment there." As the Appellant started to turn around, Officer

- 2 -

Downs, who was running behind Officer Huckabee, heard Officer Huckabee yell, "Kelly, he's got a gun." Officer Downs heard two shots. The officers continued chasing the Appellant, and the Appellant tripped again. Officer Downs said that she and Officer Huckabee were running in the middle of the street when she heard shots and that there was no cover to hide behind. Officer Huckabee repeated, "Kelly, he has got a gun," and Officer Downs fired her gun. The Appellant looked back at the officers and shot at them.

Officer Downs said that she saw the "muzzle flashes" from the Appellant's gun. Officer Downs said that the Appellant shot "[m]ultiple times" and that she saw "more than one [muzzle flash], I don't know how many." Officer Downs said that she and Officer Huckabee returned fire because they feared for their lives and that she was afraid she was going to be shot. At one point, Officer Huckabee fell onto the street, and Officer Downs did not know if he had been shot. Officer Huckabee got up, and he and Officer Downs continued to pursue the Appellant.

Officer Downs said that when the Appellant reached Wheeler Avenue, he ran between two houses. Officer Downs started to follow, but Officer Huckabee stopped her and suggested they take cover behind a nearby white sport utility vehicle (SUV) because the area between the houses was extremely dark, and they did not want to be ambushed. While hiding behind the SUV, the officers reloaded their weapons.

Officer Downs said that she and Officer Huckabee alerted other officers about the situation, advising them that shots had been fired and providing the Appellant's description. However, the Appellant was not apprehended that night.

Officer Downs said her patrol car had a video camera, and she identified a video taken that night. The video was played for the jury. Officer Downs said that the first two gunshots were fired by Officer Huckabee as the Appellant was getting up from his fall on Latta Street. Officer Downs acknowledged that she did not see the Appellant with a gun but that Officer Huckabee told her the Appellant had a gun.

Officer Downs explained that a "volley of several different shots" heard on the video occurred when the officers and the Appellant were "engaging in a gunfight." Officer Downs again stated that she and Officer Huckabee feared for their lives. Officer Downs said that she had worked with Officer Huckabee previously and that she trusted him with her life. She said that she "was trying to stop a threat. I didn't want [the Appellant] to shoot my partner nor to shoot me."

Officer Downs said that in the days following the incident, she gave a statement to Sergeant Miller. She also testified at the Appellant's preliminary hearing.

On cross-examination, Officer Downs reiterated that when she arrived at Sandy's Mini Mart, she saw the Appellant, who matched the description of the suspect given by the 911 caller. The 911 caller reported that the suspect had a gun. Officer Downs said that she did not arrest the Appellant when he did not comply with her order to approach her. She explained that she did not want to leave the safety of her vehicle to approach the Appellant, who was much larger than she. Officer Downs noted that she was not certain the Appellant had a weapon but that his movements toward his waistband and his "demeanor" led her to believe he had a weapon.

Officer Downs said that the Appellant did not hold onto his waistband the entire time he was in the mini mart's parking lot but that he "grabbed at his waistband." Officer Downs acknowledged that she did not see the Appellant with a gun while he was in the parking lot. Officer Downs said that she did not begin to run until the Appellant started to run. Officer Downs acknowledged she never told the Appellant that he was under arrest or that he was not allowed to leave. She said that after the Appellant ran from the officers, they pursued him. Officer Downs saw the Appellant fall forward, with his hands out, onto the street, and then get up.

Officer Downs acknowledged that she did not see a gun in the Appellant's possession when he stood up; however, Officer Huckabee told her, the Appellant had a gun. Officer Huckabee drew his gun and shot twice at the Appellant. Officer Downs said that she was running directly behind Officer Huckabee and "that's why I did not see the gun." Officer Downs could not recall whether the third shot was fired by her, Officer Huckabee, or the Appellant. Officer Huckabee repeated that the Appellant had a gun, and "that's when all the volleys of shooting happened." Officer Downs agreed that she did not see a gun, that she just heard gunshots, and that she saw "[m]ultiple" muzzle flashes. Officer Downs said that she never lost sight of the Appellant until he ran between the two houses.

Officer Downs testified that some vehicles were in the parking lot of the mini mart but that the only person she saw other than Officer Huckabee was the Appellant. Officer Downs said that when she reloaded her gun, she discovered she had fired eight bullets. Officer Downs was familiar with the Appellant from "previous encounters" with him. Officer Downs acknowledged she testified at the preliminary hearing that she believed "[a]fter Officer Huckabee discharge[d] his initial firearm twice, he continue[d] to discharge his firearm prior to [her] seeing any muzzle flashes."

Officer Downs acknowledged that Officer Huckabee fired the initial two shots. Officer Downs stated:

> I didn't see a gun until I saw the muzzle flashes, so I
> didn't see it at the initial when Officer Huckabee first saw it. I

did not see the gun but I trusted [Officer Huckabee] with my life, you know, he was my partner, he told me [the Appellant] had a gun. He told me twice [the Appellant] had a gun. He screamed it at me, [the Appellant] has a gun. [Officer Huckabee] started shooting and led me to believe that he was placed in danger and I was placed in danger and that is why he shot, so that is why I shot to protect both of us, to stop the threat.

Officer Downs said the muzzle flashes were in the direction of the officers. She explained that the Appellant "turned around and angled back towards us, muzzle flashes, you know, I saw them coming directly at us."

Officer Stephen Huckabee testified that on July 11, 2016, he was dressed in his uniform and driving a marked patrol car. He went to Sandy's Mini Mart in response to a call reporting that a "subject" with a firearm was in the parking lot. As Officer Huckabee was parking, he saw Officer Downs standing outside her vehicle in the parking lot, obviously trying to communicate with a person Officer Huckabee later identified as the Appellant. After Officer Downs finished parking, the Appellant "took off running." Officer Downs chased the Appellant, and Officer Huckabee joined the chase. The Appellant ran "towards the building" and proceeded towards Latta Street. As they rounded the corner of the building, Officer Huckabee was closer to the Appellant than Officer Downs. Officer Huckabee saw the Appellant trip and fall over an embankment, but the Appellant immediately got up. The Appellant held his arms out toward Officer Huckabee, and Officer Huckabee saw a firearm in the Appellant's hands. Officer Huckabee said the gun "looked like the biggest thing I had ever seen at that point. The gun was silver in color, chrome maybe." Officer Huckabee told Officer Downs the Appellant had a gun, and he thought he said it more than once.

Officer Huckabee said that he was "in fear" for himself and Officer Downs, so he unholstered his gun and shot twice at the Appellant. Officer Huckabee said that after he fired his gun, the Appellant continued running until he got to the corner of a building and fell. As the Appellant fell, he turned toward Officer Huckabee and Officer Downs. Officer Huckabee said, "And all I saw was the firearm, I saw just flashes." Officer Huckabee's ears were ringing from the gunshots, and he saw muzzle flashes from the Appellant's gun. The Appellant and Officer Huckabee exchanged gunfire, and Officer Huckabee saw more muzzle flashes.

Officer Huckabee stated that the Appellant continued running, and, at one point, Officer Huckabee fell. While he was on the ground, he reloaded his gun but lost sight of the Appellant. Other officers arrived to set up a perimeter around the area, but the Appellant was not apprehended that night.

Officer Huckabee said that he shot at the Appellant because he thought the Appellant was going to shoot him or Officer Downs. Officer Huckabee stated that after the Appellant's second fall, the Appellant shot in the officers' direction.

On cross-examination, Officer Huckabee said that he did not see anything in the Appellant's hands when the Appellant first started running; however, he noticed the Appellant was "holding his front waistband area as he was running in front of Sandy's." Officer Huckabee saw the Appellant's gun when the Appellant got up after his first fall. When asked if he cautioned the Appellant that he would be shot if he did not drop the gun, Officer Huckabee said:

> It happened so fast and so quick. I didn't understand why he would turn towards me with that gun. I just focused on the gun. As he was turning towards me like this, it was so quick. I knew that if he continued, I was probably going to be shot.

Officer Huckabee said that he repeatedly told Officer Downs that the Appellant had a gun. Officer Huckabee explained, "[W]hen I first saw the gun turning towards me, I shot twice initially. And then I didn't shoot anymore because he ran up the street. When he fell the second time is when he turned and started shooting at me and I began shooting back." Officer Huckabee did not recall if Officer Downs shot at the Appellant. During that exchange of gunfire, Officer Huckabee did not see the Appellant holding a gun, but he did see muzzle flashes from the Appellant's direction. Officer Huckabee could not recall how many muzzle flashes he saw or how many times he shot at the Appellant. He thought he fired an entire magazine.

Jean Rogers testified that she was a communications records specialist and keeper of the records for Hamilton County 911. A recording of a call that was placed to 911 on July 11, 2016, was played for the jury.

Chattanooga Police Officer Hunter Morgan testified that on July 11, 2016, he was working patrol and responded to a report of an officer-involved shooting at Sandy's Mini Mart. Upon his arrival, he saw Officer Downs. Two other officers were on the scene, and Officer Morgan helped establish a perimeter around the area.

Shortly thereafter, Officer Morgan learned that the person who shot at Officer Downs and Officer Huckabee had been identified. Officer Morgan determined the suspect's name and found his address, which was approximately a five-minute drive from Sandy's Mini Mart. Officer Morgan went to the address and saw a two-door gold Ford Explorer. He put his hand on the hood, and it felt warm, indicating the vehicle had been

driven recently. Officer Morgan noticed a live round on the center console and concluded that the car was a "possible crime scene." He stayed at the location and notified investigators.

On cross-examination, Officer Morgan said that he saw the vehicle approximately forty-five minutes after the offense. Officer Morgan stated that he thought more than one person lived at the address where he saw the vehicle.

Sloan Rankhorn testified that he was an investigator with the crime scene unit of the Chattanooga Police Department and that he responded to the crime scene at Sandy's Mini Mart. Investigator Rankhorn searched the scene of the shooting and collected seven .45 caliber shell casings. Investigator Rankhorn said that the officers were carrying .45 caliber guns that night. Investigator Rankhorn found an empty Sig-Sauer .45 caliber magazine, which he acknowledged would have fit inside the guns the officers were carrying that day. In a driveway on Wheeler Avenue, Investigator Rankhorn found a .38 caliber chrome revolver. The revolver contained five spent .38 caliber shell casings, which was the maximum number of rounds the revolver held.

Investigator Rankhorn said that he processed the gold 2001 Ford Explorer found by Officer Miller. Investigator Rankhorn found three .38 caliber live rounds "underneath the air conditioner control center console." He also found paperwork with the Appellant's name and other information.

Sergeant Victor Miller testified that on July 11, 2016, he was the homicide unit supervisor in the violent crimes bureau of the Chattanooga Police Department. He and Sergeant Holloway arrived at the scene of the shooting at 1:00 a.m. on July 12, and he was assigned as the lead investigator. He obtained security video from Sandy's Mini Mart which showed the Appellant running and being pursued by Officer Downs and Officer Huckabee.

Sergeant Miller said that he obtained an arrest warrant for the Appellant. The Appellant was located on July 13 at Erlanger Hospital, where he was being treated for a gunshot wound to his right foot. After the Appellant was treated, he was taken into custody.

On cross-examination, Sergeant Miller said that the police obtained permission to search the SUV from a female who had been driving it immediately prior to its discovery. Sergeant Miller said that his "understanding [was] that [the Appellant] went to the jail or called at the jail and said that he was injured and that they directed him to the hospital."

Sergeant Miller said that he obtained the security video from Sandy's Mini Mart. The video which was viewed by the jury, showed a gold Explorer in the parking lot. The video also showed the Appellant wearing a black shirt with a white design and black shorts.

He was carrying a white towel and appeared to have a "gun underneath the towel." Sergeant Miller said that during the 911 call, the store clerk described the suspect as a black male wearing a black shirt and black shorts and carrying a gun and a towel. Sergeant Miller acknowledged that he was unable to see the gun in the security video.

Sergeant Miller acknowledged that the police did not have the revolver or the shell casings in the revolver tested for fingerprints. Sergeant Miller said that based on his investigation, he believed that the .38 caliber gun recovered near the scene was the gun that Officer Huckabee saw in the Appellant's possession and that testing was unnecessary.

Mike Williams testified that he was the Signal Mountain Chief of Police and that he had been employed there for three and one-half years. Prior to that time, Chief Williams worked for the Chattanooga Police Department for twenty-nine years and for the Red Bank Police Department for ten years. While at the Chattanooga Police Department, Chief Williams was a training instructor and eventually was promoted to director of training for the academy. Chief Williams said that he had trained officers in the use of force with firearms and that he had been an instructor with Heckler and Koch International Training Division in Sterling, Virginia. Chief Williams also trained officers regarding aspects of officer involved shootings. Chief Williams testified without objection as an expert in law enforcement's use of force and tactics training.

Chief Williams said that "[a]n officer may use deadly force whenever he perceives that his or another officer or a civilian's life is in danger and if he doesn't take immediate action to incapacitate the threat, that somebody could be injured or die." Chief Williams reviewed the statements given by Officer Downs and Officer Huckabee, the officers' testimony at the preliminary hearing, and the video from Officer Downs' vehicle. Chief Williams opined, that Officer Downs acted appropriately in her initial contact with the Appellant. Chief Williams noted that Officer Downs responded to a call of "a suspicious person with a gun in the parking lot in a high crime area in East Chattanooga" and that she was given "an unusually good description of the suspect." Upon Officer Downs arrival, she saw the Appellant, who matched the description of the suspect. He noted that she did not approach the Appellant because she had been alerted that a gun might be involved.

Chief Williams said that when the Appellant did not respond to Officer Downs' verbal commands, she had to continue with the investigation and could not leave the area. Chief Williams approved of Officer Downs' decision not to "force the issue" until a backup officer arrived. Chief Williams stated that Officer Huckabee acted appropriately by telling Officer Downs that the Appellant had a gun, noting that officers were trained to notify another officer when a firearm was seen because the other officer may not have been in a position to see the firearm. Chief Williams said that when the Appellant fell and then immediately stood up with his arms raised in the officers' direction, Officer Huckabee acted appropriately by firing at the Appellant. Chief Williams explained that after seeing

- 8 -

the gun in the Appellant's hands, Officer Huckabee acted appropriately. Chief Williams said Officer Huckabee feared for his life.

Chief Williams said that he was familiar with Latta Street because he used to "work that area." He opined that "[i]t [was] dangerous to everybody involved" when "the officers and [the Appellant were] essentially in the middle of the street." Chief Williams explained that shots were exchanged, that no cover was available to hide behind, and that the parties involved were lucky no one was seriously injured or killed. Chief Williams said that the officers were "under deadly assault and they [had] to defend themselves."

In sum, Chief Williams determined that the officers' use of force against the Appellant was appropriate, describing their decision as "literally a textbook operation of how you would want your officer to respond under these circumstances from the very first contact all the way through to them stopping, setting up the perimeter."

On cross-examination, Chief Williams said that often, especially in open areas, crime scene officers have difficulty finding "impact points" where bullets hit. Chief Williams acknowledged that Officer Downs and Officer Huckabee fired approximately eighteen times, and he surmised that the Appellant fired at least five times if he did not reload.

Les Stover testified for the Appellant that he was the range master and primary firearms instructor for the City of Chattanooga. As part of his duties, he evaluated officers' shooting abilities and trained the officers as to when their guns should and should not be used. Stover noted that every officer was required to qualify with a pistol and a rifle twice a year. Stover stated that 100% was the highest score an officer could achieve; Officer Downs and Officer Huckabee always passed with scores of 90% or higher. Stover noted that shooting at stationary paper targets was much different from shooting at a moving target that was returning fire. Officers were taught how to recognize muzzle flashes. Stover said that when an officer saw a muzzle flash, the officer could see only "flashes of light" and could not "tell which direction they are coming from."

The jury found the Appellant guilty in count one of the lesser-included offense of the attempted voluntary manslaughter of Officer Downs, in count two of the charged offense of aggravated assault of Officer Downs, in count three of the lesser-included offense of the attempted voluntary manslaughter of Officer Huckabee, in count four of the charged offense of aggravated assault of Officer Huckabee, and in count five of the charged offense of employment of a firearm during a dangerous offense.

In a bifurcated proceeding, the jury heard proof regarding count six, which charged the Appellant with possessing a firearm while having a prior violent felony conviction. See Tenn. Code Ann. § 39-17-1307(b)(1)(A). The State introduced a certified copy of a

judgment of conviction from the Hamilton County Criminal Court, which reflected that on March 2, 2010, the Appellant was convicted of aggravated assault, a class C felony. The jury found the Appellant guilty as charged.

On appeal, the Appellant contends that (1) the evidence was not sufficient to sustain his convictions; (2) the trial court erred by not allowing him to impeach Officer Downs with her preliminary hearing testimony regarding the number of muzzle flashes she saw; (3) the trial court erred by allowing the State to introduce proof of the Appellant's prior conviction of aggravated assault during the bifurcated proceeding on count six; and (4) the trial court erred in imposing consecutive sentencing.

## II. Analysis

### A. Sufficiency of the Evidence

First, the Appellant challenges the sufficiency of the evidence sustaining his convictions. On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

### A. Attempted Voluntary Manslaughter

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Relevant to this case, a person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2). It is within the jury's purview to decide whether the person has acted after adequate provocation. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

In the instant case, the Appellant argues the State adduced no proof that he tried to kill the officers, no proof he had a firearm in his possession, and no proof that bullets came near the officers. Instead, the proof showed that the officers shot at him. In the light most favorable to the State, the proof revealed that Officer Downs responded to a report of an individual with a gun in the parking lot of Sandy's Mini Mart. The caller described the suspect as a tall, slender, black male with a "low haircut" and a goatee. The man was wearing a black shirt and black shorts. Upon arriving at the mini mart, Officer Downs saw the Appellant, who matched the caller's description of the suspect. The Appellant did not comply with the officer's order to approach her and repeatedly grabbed at his waistband as if he had a gun. After Officer Huckabee arrived, the Appellant ran from the officers. While being chased by the officers, the Appellant fell. As he was on the ground, the Appellant turned toward the officers, raised his arms, and pointed a large silver or chrome gun toward the officers. Officer Huckabee warned Officer Downs that the Appellant had a gun. Officer Huckabee, who feared for his life and Officer Downs' life, fired two shots at the Appellant. The chase continued, and the Appellant and the officers exchanged gunfire. Officer Downs said that she could not see the gun, but she saw muzzle flashes in the officers' direction when the Appellant fired his gun. The officers testified that during the exchange of gunfire, they were in the middle of the street and had no place to hide. A .38 caliber chrome revolver was found in a driveway on Wheeler Avenue, which was on the route the Appellant ran, and three live .38 caliber rounds and paperwork bearing the Appellant's name and information were found in the gold 2001 Ford Explorer. Our supreme court has stated that "whether a knowing killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question." State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (citing Johnson, 909 S.W.2d at 464, Wilson v. State, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978)). The proof was sufficient to sustain the Appellant's convictions of attempted voluntary manslaughter. See State v. Arterious North, No. E2015-00957-CCA-R3-CD, 2016 WL 6248598, at *17 (Tenn. Crim. App. at Knoxville, Oct. 26, 2016).

B. Aggravated Assault

- 11 -

Next, the Appellant contends that the proof was insufficient to sustain the Appellant's conviction of aggravated assault of Officer Downs because she never saw the Appellant with a weapon; therefore, she was not placed in fear by "display" of a weapon. Regarding Officer Huckabee, the Appellant contends that Officer Huckabee "saw what he proposed to be a gun. . . . [T]he gun that was found was not found on the Appellant, and there was no fingerprints or DNA on the firearm that belonged to the Appellant." The State responds that as charged in the indictment, the Appellant committed aggravated assault by "use" of deadly weapon; accordingly, the State was not required to prove that the Appellant "displayed" a deadly weapon. We agree with the State.

In the instant case, the indictment charged that the Appellant committed the aggravated assault of the officers by causing the officers to "reasonably fear imminent bodily injury by use of a deadly weapon." See Tenn. Code Ann. § 39-13-102(A)(1)(a)(iii). The proof at trial, in the light most favorable to the State, revealed that after the Appellant fled from Officer Downs and Officer Huckabee, the Appellant tripped and, while attempting to escape, pointed a gun at the officers. Officer Huckabee saw the Appellant point a large chrome gun at the officers, and he repeatedly cautioned Officer Downs that the Appellant had a gun. Once the chase resumed, Officer Downs heard shots and saw muzzle flashes from the Appellant's gun fired in the direction of the officers. Officer Downs said that she was afraid for her life and for Officer Huckabee's life. Officer Huckabee testified that he was afraid he would be shot or that Officer Downs would be shot. After the chase ended, the police found a .38 caliber chrome revolver in a driveway on Wheeler Avenue, which was on the route the Appellant ran. Three live .38 caliber rounds were found inside a gold 2001 Ford Explorer along with paperwork bearing the Appellant's name and information. The proof establishes that that the Appellant caused the officers to "reasonably fear imminent bodily injury by use of a deadly weapon." Accordingly, we conclude that the proof was sufficient to sustain the Appellant's convictions of aggravated assault. See State v. Eric Battle, No. W2017-01234-CCA-R3-CD, 2018 WL 4190790, at *6 (Tenn. Crim. App. at Jackson, Aug. 31, 2018).

### C. Employment of a Firearm during an Attempted Dangerous Felony

Tennessee Code Annotated section 39-17-1324(b)(1) provides that it is an offense to employ a firearm during the commission of or the attempt to commit a dangerous felony. Tenn. Code Ann. § 39-17-1324(a). Attempted voluntary manslaughter is specified as a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(C), (M). As we concluded earlier, the evidence was sufficient to sustain the Appellant's convictions of attempted voluntary manslaughter. Further, there is ample proof that the Appellant used a gun during the commission of that offense, namely the officers saw muzzle flashes, heard shots fired, and Officer Huckabee saw the Appellant with the gun. Accordingly, the proof is sufficient to sustain this conviction.

- 12 -

## D. Possession of a Firearm with a Prior Violent Felony Conviction

The Appellant was charged with unlawfully possessing a firearm after he had been convicted of a "felony crime of violence." Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that "[a] person commits an offense who unlawfully possesses a firearm . . . [and h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." As we stated earlier, the proof was sufficient to establish that the Appellant possessed a firearm when he shot at the officers. The State introduced proof that the Appellant had a prior conviction of aggravated assault, which is a crime of violence. See Tenn. Code Ann. § 39-17-1301(3). Therefore, the proof is sufficient to sustain his conviction.

## B. Impeachment

The Appellant contends that the trial court erred by refusing to allow him to impeach Officer Downs with her preliminary hearing testimony. The Appellant contends that Officer Downs' testimony at trial regarding the number of muzzle flashes she saw was inconsistent with her testimony at the preliminary hearing.

The record reveals that on cross-examination at trial, Officer Downs agreed that she did not see a gun but that she heard gunshots and saw multiple muzzle flashes. Upon further questioning, Officer Downs said that she saw more than one muzzle flash and possibly three or four muzzle flashes.

Defense counsel asked if Officer Downs recalled testifying at the preliminary hearing, and she responded that she did. Upon further questioning by defense counsel, Officer Downs said that she did not recall testifying at the preliminary hearing that the Appellant fired his gun only two times. Defense counsel approached Officer Downs, referred to the transcript from the preliminary hearing, and stated, "Looking over here at fourteen, when the [Appellant] falls over the embankment. Officer Huckabee states he has a gun. 'Did you fire that weapon at that point? No, it took me after he fired his two rounds.' Do you recall testifying to that?"

The State objected, arguing that the testimony was not "the same subject matter." During a bench conference, the State argued, "I think [defense counsel] is trying to impeach [Officer Downs] on the number of times [the Appellant] shot." The State noted that the testimony defense counsel was quoting concerned "Officer Huckabee firing two rounds not [the Appellant]."

Defense counsel then asked Officer Downs about her testimony at the preliminary hearing regarding whether the Appellant shot at her while he was on Latta Street or Wheeler Street. Officer Downs responded that the Appellant started shooting on Latta

Street and that he continued shooting as he went around the corner onto Wheeler Street. Officer Downs did not know how many rounds the Appellant fired on each street. The trial court sua sponte asked for the jury to step out of the courtroom so the parties could discuss the matter.

After the jury left the courtroom, the trial court noted that Officer Downs' trial testimony was that she saw multiple muzzle flashes but did not know how many times the Appellant fired his gun. At the preliminary hearing, Officer Downs testified that she was not sure how many muzzle flashes she saw but that she saw multiple flashes. The trial court stated that it did not see an inconsistency between Officer Downs' preliminary hearing testimony and her trial testimony. The trial court said, "She testified that it was multiple times, not sure if it was more than two here in this trial. At the preliminary hearing she said she knew at least twice, she doesn't know how many more." The trial court found that there was no inconsistency. On appeal, the Appellant challenges this ruling.

Tennessee Rule of Evidence 613(b) permits the impeachment of a witness with a prior inconsistent statement, stating:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

We note that "a direct contradiction is not necessary for a statement to be inconsistent, and it is sufficient if the inconsistency has a reasonable tendency to discredit the witness' testimony." State v. Hall, 976 S.W.2d 121, 150 (Tenn. 1998) (appendix); see Neil P. Cohen et al., Tennessee Law of Evidence, § 6.13[3] (6th ed. 2011) (citation and internal quotation marks omitted). "The trial court's assessment of whether a statement is inconsistent will only be overturned if the trial court abused its discretion." State v. Terrence Gardner, No. W2008-01089-CCA-R3-CD, 2009 WL 3172124, at *7 (Tenn. Crim. App. at Jackson, Oct. 5, 2009) (citing Davis v. Hall, 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995)).

In the instant case, the trial court noted that Officer Downs "testified that it was multiple times, not sure if it was more than two here in this trial. At the preliminary hearing she said she knew at least twice, she doesn't know how many more." The trial court found Officer Downs' preliminary hearing testimony was not a prior inconsistent statement. We agree and conclude that the trial court did not abuse its discretion in this ruling. See State v. Rodney Darnell Robinson, No. M2019-00303-CCA-R3-CD, 2020 WL 1923152, at *49 (Tenn. Crim. App. at Nashville, Apr. 21, 2020), perm. to appeal denied, (Tenn. Aug. 7, 2020).

- 14 -

## C. Evidence of Prior Conviction

The jury found the Appellant guilty on counts one through five. The court bifurcated count six, which charged the Appellant with "unlawfully and knowingly possess[ing] a firearm, after he, the [Appellant], had been convicted of a felony involving the use or attempted use of force, violence or a deadly weapon, to-wit: Aggravated Assault." Following the bifurcated proceeding, the jury found the Appellant guilty on count six. On appeal, the Appellant contends that the trial court erred by allowing the State to present evidence that he had a prior conviction of aggravated assault during the proof on count six despite his offer to stipulate that he had a prior conviction involving the use of force.

At the bifurcated proceeding, defense counsel stated that the Appellant was willing to stipulate that he had a "qualifying felony" and asked the trial court to give "an Old Chief instruction which basically just says qualifying felony conviction instead of aggravated assault."[1] The State asserted that despite the stipulation, it was entitled to admit a certified copy of the judgment reflecting the conviction of aggravated assault as evidence of a prior felony conviction involving force and violence. The State noted that unlike Old Chief, where all of the offenses were tried in one proceeding, count six of the charges against the Appellant was bifurcated, which prevented the jury from hearing the prejudicial information when determining the Appellant's guilt in counts one through five. The trial court rejected defense counsel's request for the instruction.

On appeal, the Appellant cites Old Chief and State v. James, 81 S.W.3d 751 (Tenn. 2002), in support of his contention that the trial court should have allowed him to stipulate that he had a prior violent felony conviction that satisfied the charge in count six instead of allowing the State to adduce proof of the nature of the prior conviction. However, as the State notes, in State v. Foust, 482 S.W.3d 20, 46 (Tenn. Crim. App. 2015), which was decided after Old Chief and James, this court addressed a defendant's complaint "that the trial court erred by not allowing him to stipulate that he had been convicted of prior felonies without disclosing that the convictions were for crimes of force and violence." On appeal, the defendant contended that telling the jury that he had previous convictions of crimes of violence and force was extremely prejudicial "and that he was faced with an impossible choice between accepting the State's offer that he stipulate to having prior felony convictions involving violence and force or having the State prove the same with certified copies of his prior convictions." Id.

This court noted that when a defendant was charged with a "status offense," specific references to the prior felony were relevant to establish an essential element of the charged offense. Id. at 47. This court stated that "[i]n the limited circumstance that the defendant

---

[1]Old Chief v. United States, 519 U.S. 172 (1997).

- 15 -

offers to stipulate the applicable status, the probative value of evidence of the defendant's prior convictions is, 'as a matter of law, outweighed by the risk of unfair prejudice.'" Id. (quoting James, 81 S.W.3d at 762). This court cautioned that "'a defendant can offer to stipulate to the elements of an offense, but by doing so cannot prevent the jury from learning of an element of the offense or the stipulation.'" Id. (quoting State v. Marvin Senathan Hall, Jr., No. W2008-00933-CCA-R3-CD, 2009 WL 1643435, at *8 (Tenn. Crim. App. at Jackson, June 12, 2009)).

Notably, in Foust, the State needed to prove not only that the defendant had a prior felony conviction but also that the felony was a crime of violence and force. Id. This court noted that the defendant's stipulation that he was a convicted felon and that he had committed a felony involving force failed to encompass the elements the State was required to prove; therefore, the trial court's refusal to accept the stipulation was not error. Id. Subsequently, the parties agreed to a stipulation that the defendant had "'a previous felony conviction involving force' and 'a previous felony conviction involving violence.'" Id. at 46.

Nevertheless, this court noted

> that the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings and address the unlawful possession of a firearm charge separately.

Id. at 46-47.

On appeal, the Appellant seems to claim that despite the bifurcation of count six, the trial court should have allowed the Appellant to stipulate that he had a "qualifying felony" instead of allowing the State to adduce proof that the conviction was an aggravated assault. This court has explained that "stipulating to prior [qualifying] felonies and requesting bifurcated proceedings [each can be] valid avenues for a defendant charged with possession of a firearm as a convicted felon." State v. Brandon Johnson, No. W2018-01222-CCA-R3-CD, 2019 WL 6045569, at *14 (Tenn. Crim. App. at Jackson, Nov. 14, 2019), perm. to appeal denied, (Tenn. Apr. 1, 2020). As the State notes, this court has held that "[w]ith respect to status offenses, . . . 'specific reference[s] to [a] defendant's prior felonies' are 'relevant to establish an essential element of the crime for which the defendant is being tried.'" Foust, 482 S.W.3d at 46-47 (quoting James, 81 S.W.3d at 760-61). Additionally, given the bifurcation of the proceedings, we fail to see how the Appellant was prejudiced. We conclude that the trial court did not abuse its discretion.

## D. Consecutive Sentencing

Finally, the Appellant contends that the trial court erred by imposing consecutive sentencing. This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable

- 17 -

range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, the State maintained that the Appellant was a Range II offender. The State asserted that the Appellant had a conviction of theft in Dade County, Georgia, for bringing a stolen automobile into the state. The State contended that the Georgia conviction was the equivalent of a class E felony in Tennessee. The Appellant also had a class C felony conviction of aggravated assault in Hamilton County. The State noted that the Appellant had also been convicted of the felonious possession of a controlled substance in Catoosa County, Georgia, which the State contended would have been a class A misdemeanor in Tennessee.

Michelina Ralston testified that she was employed by the Tennessee Board of Probation and Parole and that she prepared the Appellant's presentence report. The State introduced the report as an exhibit.

Ralston said that, in addition to the one felony conviction in Georgia and the one felony conviction in Tennessee, she discovered that the Appellant had six misdemeanor convictions in Tennessee and one misdemeanor conviction in Georgia. The Appellant also had two juvenile court adjudications of aggravated burglary as well as numerous juvenile adjudications of misdemeanor offenses. Ralston said that the Appellant had probation violations in Georgia and Tennessee.

Ralston stated that the Appellant had a general educational development certificate (GED). Ralston said that she completed a "STRONG-R assessment" of the Appellant for the presentence report. The assessment revealed that the Appellant was a high risk to commit another violent offense based upon his history of violent offenses.

On cross-examination, Ralston said that the Appellant reported that he had been "working on and off." Ralston acknowledged that the Appellant's only prior violent offenses were aggravated assaults.

On redirect examination, Ralston explained that she did not "classify [the Appellant] as violent"; however, she agreed that "[t]he answers on the questionnaire for the STRONG-R assessment that were inputted in the computer then yielded a result of a high violence."

Officer Downs testified that Sandy's Mini Mart was "very busy" and that other people were around at the time of the offense. Officer Downs said the area behind the mini mart where the shooting took place was residential, noting that when the officers and the

Appellant were exchanging gunfire, she was approximately five feet from a house. Officer Downs said that she was "terrified" for herself and for Officer Huckabee, especially because they had no place to "take cover."

Officer Downs said that the incident had changed the way she responded to calls, explaining that she was nervous and feared being shot. Since the shooting, she had given birth to a child and had become a training officer so she would be able to come home safely to her child. She said that she thought about the shooting every day and occasionally dreamed about it.

Officer Huckabee testified that the shooting had "made [him] a lot more paranoid on calls." He said that he occasionally thought about the shooting but that he did not think about it every day.

The State also noted that the Appellant was on probation in the Hamilton County General Sessions Court at the time he committed the instant offenses.

Ed Duke, an investigator with the Hamilton County District Attorneys' Office; Sherry Bradford, the victim/witness coordinator for the district attorneys' office in "the second division of Criminal Court"; and Keith Jennings, a former patrol officer with the Chattanooga Police Department testified concerning problems establishing the facts underlying the Appellant's Georgia automobile theft conviction.

The trial court found the Appellant to be a standard, Range I offender. The trial court found the only mitigating factor applicable was the Appellant's attempted rehabilitation while he was in prison. See Tenn. Code Ann. § 40-35-113(13). However, the trial court attributed little weight to this mitigating factor because of the Appellant's continuing use of marijuana.

The trial court applied enhancement factor (1), that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, to all of the Appellant's convictions. Tenn. Code Ann. § 40-35-114(1). The trial court noted that the Appellant had "one Tennessee felony, two felonies under Georgia law, seven misdemeanors, [and] two juvenile felony convictions which would be [felonies] if convicted as an adult." The trial court applied enhancement factor (13)(C) to all of the Appellant's convictions, noting that at the time the felonies were committed, the Appellant was released on probation. Tenn. Code Ann. § 40-35-114(13)(C). The trial court noted that the Appellant had been placed on probation for a drug offense by the Hamilton County General Sessions Court on May 27, 2016. Regarding the Appellant's aggravated assault convictions, the trial court applied enhancement factor (19), which provides:

> [i]f the [Appellant] is convicted of the offense of aggravated assault pursuant to § 39-13-102, the victim of the aggravated assault was a law enforcement officer. . . ; provided, that the victim was performing an official duty and the [Appellant] knew or should have known that the victim was such an officer or employee.

Tenn. Code Ann. § 40-35-114(19).

The trial court noted that the Appellant was convicted in counts one and three of attempted voluntary manslaughter, a class D felony; in counts two and four of aggravated assault, a class C felony; in count five of employment of a firearm during a dangerous offense, a class C felony; and in count six of possession of a firearm with a prior violent felony conviction, a class C felony. The trial court sentenced the Appellant to four years for the convictions in counts one and three and to six years for the convictions in counts two, four, five, and six.

The trial court stated that pursuant to statute, the sentence for count five was required to be served consecutively to either count one or count three. See Tenn. Code Ann. § 39-17-1324(e)(1) ("A sentence imposed for a violation of subsection (a) or (b) shall be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony.").

Additionally, the trial court found consecutive sentencing to be appropriate because the Appellant had an extensive criminal history. Tenn. Code Ann. § 40-35-115(b)(2). The trial court also found that the Appellant was a dangerous offender who had no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4). The trial court ordered the sentences for counts one and two to be served concurrently with each other, the sentences for counts three and four to be served concurrently with each other, and the sentences for count two and six to be served concurrently with each other. The trial court ordered that count four be served consecutively to count two and that count five be served consecutively to count three, for a total effective sentence of sixteen years.

The trial court noted that the thirty-six-year-old Appellant's employment history was "spotty," noting that he had worked sporadically, generally for cash. The trial court noted with favor that the Appellant had his GED.[2] The trial court observed that the Appellant had a long history of substance abuse. The trial court stated that the Appellant had failed to accept responsibility or express remorse for his actions, which reflected poorly

---

[2] "'GED' means a general educational development credential awarded by a state-approved institution or organization." Tenn. Code Ann. § 49-4-902(20).

on his rehabilitative potential. The trial court further stated that measures less restrictive than confinement had been applied unsuccessfully to the Appellant and that he would not likely abide with the terms of probation. The trial court also found that the Appellant had an extensive criminal history. Accordingly, the trial court denied the Appellant alternative sentencing.

On appeal, the Appellant specifically contends that the trial court should not have ordered the sentences in counts three and four to be served consecutively to the sentence for the conviction in count two. The Appellant maintains that he had only one prior violent felony and that the remainder of his prior convictions were for theft or drugs. Accordingly, the Appellant contends that nothing in his criminal history qualified him as a dangerous offender or a professional criminal.

Initially, we note that our review of the record reveals that the trial court never found the Appellant to be a professional criminal. However, the trial court found that the Appellant was a dangerous offender. Consecutive sentencing is appropriate when a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In finding that the Appellant was a dangerous offender whose behavior indicates little or no regard for human life, the trial court stated that the Appellant had engaged in "essentially a shootout in the streets of Chattanooga, in a populated area, in a highly visited site, ultimately continuing into a residential neighborhood." The trial court further found that that "[t]he lack of hesitation [about committing a crime in which the risk to human life is high] here is demonstrated clearly by the fact that the shootout starts almost immediately. As soon as the officers, on the videotape, round the edge of the building, the shootout starts almost immediately, and it took place, the offense took place where the general public might have been endangered." See State v. Stevie Williamson, No. W2019-00437-CCA-R3-CD, 2020 WL 1274770, at *8 (Tenn. Crim. App. at Jackson, Mar. 16, 2020), perm. to appeal denied, (Tenn. Nov. 17, 2020).

The trial court found that confinement for an extended period of time was necessary to protect the public from further criminal activity. The trial court stated that the Appellant did not draw his gun accidentally but that he did so intentionally "to avoid detection and possible arrest for the commission of a felony which was the possession of a firearm with

- 21 -

a prior felony conviction." The trial court noted that the Appellant had a history of probation violations, which indicated the public needed to be protected from his behavior. The trial court further noted that the Appellant had failed as his attempts at rehabilitation. The trial court observed that the Appellant's prior violent felony conviction did not deter him from engaging in the instant "dangerous and violent" criminal conduct. See State v. Andre Bowen, No. W2019-01210-CCA-R3-CD, 2021 WL 1400929, at *10 (Tenn. Crim. App. at Jackson, Apr. 13, 2021), perm. to appeal denied, (Tenn. June 15, 2021).

The trial court asserted that the aggregate length of the sentences was reasonably related to the severity of the offenses for which the Appellant was convicted. The court found that the circumstances surrounding the commission of the offenses were aggravated, specifically stating that the Appellant gave "absolutely no indication of any concern for the possible victims in this case" and that the Appellant "possessed and employed a dangerous weapon and the entire purpose of the exercise was an attempt to interfere with the administration of justice." We conclude that the trial court did not abuse its discretion by finding the Appellant to be a dangerous offender.

Moreover, the trial court also found that the Appellant's criminal history was extensive. The Appellant had three prior felonies, one in Tennessee and two in Georgia, and at least seven prior misdemeanors, which were sufficient to constitute an extensive criminal history. See State v. Jawara Jones, No. M2017-01666-CCA-R3-CD, 2020 WL 2079270, at *11 (Tenn. Crim. App. at Nashville, Apr. 30, 2020). A trial court may order that multiple sentences be consecutive if the court finds by a preponderance of the evidence that the defendant "is an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2). Given the Appellant's numerous prior convictions, we conclude that the trial court did not abuse its discretion by finding that the Appellant had an extensive criminal history. Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). The Appellant is not entitled to relief.

### III. Conclusion

In sum, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 22 -